ORAL ARGUMENT NOT YET SCHEDULED

Case No. 23-7059

# In the United States Court of Appeals for the District of Columbia Circuit

DARRELL WILCOX AND MICHAEL MCGUIRE, individually and on behalf of the Georgetown University Defined Contribution Retirement Plan and the Georgetown University Voluntary Contribution Retirement Plan,

*Plaintiffs-Appellants*,

v.

GEORGETOWN UNIVERSITY, CHRISTOPHER AUGOSTINI, and GEOFF CHATAS

*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the District of Columbia, Case No. 1:18-cv-422, Hon. Amy Berman Jackson

_____

## BRIEF OF PLAINTIFFS-APPELLANTS

_____

| | |
|---|---|
| ELLEN T. NOTEWARE | Todd Schneider |
| ABIGAIL J. GERTNER | JAMES A. BLOOM |
| NATALIE LESSER | SCHNEIDER WALLACE |
| BERGER MONTAGUE PC | COTTRELL KONECKY LLP |
| 1818 MARKET STREET, SUITE 3600 | 2000 POWELL STREET, SUITE 1400 |
| PHILADELPHIA, PA 19103 | EMERYVILLE, CALIFORNIA 94608 |

*ADDITIONAL COUNSEL ON SIGNATURE PAGE*

**ATTORNEYS FOR PLAINTIFFS-APPELLANTS**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTORITIES ................................................................ iii

GLOSSARY OF DEFINED TERMS ........................................viii

I.  STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........1

II. STATEMENT OF THE CASE ...........................................................2

    A.  FACTUAL BACKGROUND ......................................................2

        1. The Plans Paid Excessive Recordkeeping Fees.....................4

        2. The Plans Maintained Imprudent Investments....................9

    B.  PROCEDURAL HISTORY ........................................................13

III. SUMMARY OF THE ARGUMENT .................................................15

IV. LEGAL STANDARD ........................................................................18

V.  ARGUMENT ....................................................................................22

    A.  The District Court's Denial of Leave to Amend and its Opinion Dismissing the Original Complaint is Contrary to *Hughes v. Northwestern Univ.* ("*Hughes I*"), 142 S. Ct. 737 (2022)...........22

        1. The FAC's Allegations Regarding Other University Plans Support Plaintiffs' Excessive Fees Claims ..........................28

        2. The Proposed FAC's Allegations About Asset-Based Fees Bolster Plaintiffs' Claims.....................................................34

        3. The District Court Erred in Ruling that Plaintiffs Provided No Factual Support for a Flat $35 Per Participant Recordkeeping Fee .............................................................35

        4. The FAC's Allegations about Investment Options Menus States a Claim for Imprudence..........................................39

        5. Plaintiffs Adequately Allege that Defendants Breached their Duties by Failing to Obtain Sufficient 408b-2 Disclosures. 41

        6. Plaintiffs Adequately Allege Defendants Breached their Duties by Misrepresenting the Variable Annuities ............43

       7.   Plaintiffs Adequately Alleged that Defendants Violated Their Fiduciary Duty of Candor ..................................................... 45

  B.   Plaintiffs Have Standing to Assert All the Claims in the FAC ........................................................................................ 48

       1.   Plaintiffs Have Constitutional Standing to Challenge Defendants' Fiduciary Decisionmaking Process Concerning All Plans' Funds and Fees .................................................... 48

       2.   Plaintiff Wilcox Has Constitutional Standing to Challenge the Transfer Restrictions and Surrender Charge in the TIAA Traditional Annuity ............................................................ 51

VI. CONCLUSION ............................................................................ 55

CERTIFICATE OF COMPLIANCE ...................................................... 57

CERTFICATE OF FILING AND SERVICE ........................................... 58

ii

# TABLE OF AUTHORITIES

## Cases

*Ackerman v. Waranco, Inc.*
   55 F.3d 117 (3d Cir. 1995)....................................................................47

*Albert v. Oshkosh Corp.*,
   47 F.4th 570 (7th Cir. 2022)..........................................................31, 36

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...............................................................................20

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .........................................................................20, 21

*Boley v. Universal Health Servs.*,
   36 F.4th 124 (3d Cir. 2022) ............................................................17, 49

*Braden v. Wal-Mart Stores, Inc.*,
   588 F.3d 585 (8th Cir. 2009) ............................................................3, 20

*Brown v. MITRE Corp.*,
   2023 WL 2383772 (D. Mass. Mar. 6, 2023)...................................31, 33

*Bugielski v. AT&T Servs.*,
   No. 21-56196, --- F.4th ---, 2023 U.S. App. LEXIS 20113
   (9th Cir. Aug. 4, 2023)............................................................17, 41, 52

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*,
   148 F.3d 1080 (D.C. Cir. 1998)............................................................18

*Cassell v. Vanderbilt Univ.*,
   No. 3:16-cv-02086 (M.D. Tenn. Jan. 5, 2018) .........................24, 25, 37

*Cates v. Trustees of Columbia Univ. in City of New York*,
   No. 16-CV-6488 (KBF), 2017 WL 3724296
   (S.D.N.Y. Aug. 28, 2017) ..............................................................24, 26

*Cavalier v. Catholic Univ. of Am.*,
   306 F. Supp. 3d 9 (D.D.C. 2018) .........................................................21

*Chero-Key Piping Co. v. Great-West Life & Annuity Ins. Co.,*
   2010 WL 1169957, n.14 (S.D. Tex. Mar. 23, 2010) ..............................47

*Clark v. Duke Univ.*,
 No. 1:16-CV-1044, 2017 WL 4477002 (M.D.N.C. May 11, 2017) .. 24, 26

*Coppel v. SeaWorld Parks & Ent., Inc.*,
 2023 WL 2942462 (S.D. Cal. Mar. 22, 2023) ...................................... 31

*Coyer v. Univar Sols. USA Inc.*, 2022 WL 4534791
 (N.D. Ill. Sept. 28, 2022) ................................................................... 33

*Cunningham v. Cornell Univ.*,
 No. 16-CV-6525 (PKC), 2017 WL 4358769
 (S.D.N.Y. Sept. 29, 2017) ...................................................... 24, 25, 26

*Daugherty v. Univ. of Chicago*,
 No. 17 C 3736, 2017 WL 4227942 (N.D. Ill. Sept. 22, 2017) ......... 24, 26

*Davis v. Washington Univ. St Louis*,
 No. 4:17-CV-1641 RLW, 2018 U.S. Dist. LEXIS 167594 (E.D. Mo.
 Sept. 28, 2018), *aff'd in part, rev'd in part and remanded*, 960 F.3d
 478 (8th Cir. 2020) ...................................................................... 20, 26

*Divane v. Northwestern Univ.*,
 953 F.3d 980 (7th Cir. 2020) ............................................................. 26

*Doe #1 v. Am. Fed'n of Gov't Emps.*,
 554 F. Supp. 3d 75 (D.D.C. 2021) ..................................................... 21

*Donovan v. Bierwirth*,
 680 F.2d 263 (2d Cir. 1982) ................................................................ 3

*Faber v. Metro. Life Ins. Co.*,
 648 F.3d 98 (2d Cir. 2011) ................................................................ 54

*Fifth Third Bancorp v. Dudenhoeffer*,
 573 U.S. 409 (2014) .......................................................................... 20

*Firestone Tire & Rubber Co. v. Bruch*,
 489 U.S. 101 (1989) .......................................................................... 47

*Foman v. Davis*,
 371 U.S. 178 (1962) .......................................................................... 19

*Hecker v. Deere & Co.*,
 569 F.3d 708 (7th Cir. 2009) ............................................................. 25

*Henderson v. Emory Univ.*,
 252 F. Supp. 3d 1344 (N.D. Ga. 2017) .................................... 24, 25, 26

iv

*Horvath v. Keystone Health Plan E., Inc.*,
  333 F.3d 450 (3d Cir. 2003)................................................54

*Hughes v. Northwestern Univ.*,
  142 S. Ct. 737 (2022) (*"Hughes I"*) ......1, 3, 16, 19, 22, 26, 27, 39, 40, 54

*Hughes v. Northwestern Univ.*,
  63 F.4th 615 (7th Cir. 2023) ("*Hughes II*") ........................ 19, 20, 26, 32

*Humane Soc'y of the U.S. v. Vilsack*,
  797 F.3d 4 (D.C. Cir. 2015) ................................................21

*Iannone v. Autozone, Inc.*,
  No. 19-cv-2779-MSN-tmp, 2022 U.S. Dist. LEXIS 185251
  (W.D. Tenn. Aug. 12, 2022) ................................................50

*In re Sutter Health ERISA Litig.*,
  No. 1:20-CV-01007-JLT, 2023 WL 1868865
  (E.D. Cal. Feb. 9, 2023) ........................................................39

*Kelly v. Johns Hopkins Univ.*,
  No. CV GLR-16-2835, 2017 WL 4310229
  (D. Md. Sept. 28, 2017)................................................24, 26

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
  323 F.R.D. 145 (S.D.N.Y. 2017) ........................................50

*Loren v. Blue Cross & Blue Shield of Mich.*,
  505 F.3d 598 (6th Cir. 2007) ................................................53

*Lucero v. Credit Union Ret. Plan Ass'n*,
  2023 WL 2424787 (W.D. Wis. Mar. 9, 2023).....................33

*Moler v. Univ. of Maryland Med. Sys.*,
  No. 1:21-CV-01824-JRR, 2022 WL 2756290
  (D. Md. July 13, 2022) ................................................24, 26

*Munro v. Univ. of S. California*,
  No. 2:16-CV-06191-VAP-EX, 2019 WL 4543115
  (C.D. Cal. Aug. 27, 2019).................................... 24, 25, 26, 38

*Nat'l Sec. Sys., Inc. v. Iola*,
  700 F.3d 65 (3d Cir. 2012)................................................47

*Nicolas v. Trustees of Princeton Univ.*,
  No. CV 17-3695, 2017 WL 4455897 (D.N.J. Sept. 25, 2017) ... 24, 25, 26

*Osborn v. Visa Inc.*,
    797 F.3d 1057 (D.C. Cir. 2015).............................................................19

*Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co.*,
    698 F.2d 320 (7th Cir. 1983) ..............................................................47

*Peters v. Aetna Inc.*,
    2 F.4th 199 (4th Cir. 2021)..................................................................53

*Ruilova v. Yale-New Haven Hosp., Inc.*,
    No. 3:22-CV-00111-MPS, 2023 WL 2301962 (D. Conn. Mar. 1, 2023) 39

*Sacerdote v. N.Y. Univ.*,
    9 F.4th 95 (2d Cir. 2021) .....................................................................20

*Sacerdote v. New York Univ.*,
    No. 16-CV-6284 (KBF), 2017 WL 3701482
    (S.D.N.Y. Aug. 25, 2017) ..............................................................24, 37

*Santiago v. Univ. of Miami*,
    No. 1:20-CV-21784, 2021 WL 1173164 (S.D. Fla. Mar. 1, 2021), *report*
    *and recommendation adopted,* No. 1:20-CV-21784, 2021 WL 1165441
    (S.D. Fla. Mar. 26, 2021) .........................................................24, 25, 38

*Short v. Brown Univ.*,
    No. 17-318 (D.R.I. July 2018)......................................24, 25, 26, 37

*Silva v. Evonik Corp.*,
    2020 WL 12574912 (D.N.J. Dec 30, 2022) ......................................42

*Smith v. CommonSpirit Health*,
    37 F.4th 1160 (6th Cir. 2022)..............................................................31

*Sweda v. Univ. of Pa.*,
    923 F.3d 320 (3d Cir. 2019)..............................................20, 26, 48, 49

*Taylor v. United Techs. Corp.*,
    2008 WL 2333120 (D. Conn. June 3, 2008) ......................................50

*Tibble v. Edison Int'l*,
    575 U.S. 523 (2015) .............................................3, 16, 19, 22, 23, 45

*Tracey v. Massachusetts Inst. of Tech.*,
    No. CV 16-11620-NMG, 2017 WL 4478239
    (D. Mass. Oct. 4, 2017) ................................................................24, 25

*Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*,
  2016 WL 4507117 (C.D. Cal. Aug. 5, 2016) ........................................50

*Varity Corp. v. Howe,*
  516 U.S. 489 (1996) .....................................................................47

*Vellali v. Yale Univ.*,
  308 F. Supp. 3d 673 (D. Conn. 2018) .....................................24, 25, 38

*Wilcox v. Georgetown Univ.*,
  987 F.3d 143 (D.C. Cir. 2021)...............................................................14

**Statutes**

ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B)...............................................52

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A)...................................................3

ERISA § 404, 29 U.S.C. § 1104 ................................................22, 43, 47

ERISA § 406(a), 29 U.S.C. § 1106 .........................................................52

ERISA § 408, 29 U.S.C. § 1108 .........................................1, 4, 41, 43, 52

ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) .................................................48

ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) ...............................17, 46, 53

**Regulations**

29 C.F.R. § 2550.408b-2 .........................................................1, 4, 41, 42, 52

**Other Authorities**

*Black's Law* Dictionary 625 (6th ed. 1990) .............................................47

**Rules**

F.R.C.P. 12(b)(1) ...............................................................................19

F.R.C.P. 12(b)(6) ...............................................................................19

F.R.C.P. 59(e)....................................................................................13

# GLOSSARY OF DEFINED TERMS

- "Complaint" means the original complaint in this matter filed on February 23, 2018. Dkt. # 1.

- "DC Plan" means the Georgetown University Defined Contribution Retirement Plan.

- "Defendants" mean Defendants-Appellees Georgetown University, the Finance Subcommittee of the President's Executive Committee, and Christopher Augostini.

- "ERISA" means the Employee Retirement Security Act of 1974, 29 U.S.C. § 1001, *et seq.*

- "Motion to Dismiss Opinion" means the district court's opinion dated January 8, 2019 granting Defendants' motion to dismiss the original complaint. Dkt. # 35.

- "FAC" means Plaintiffs' proposed First Amended Complaint – Class Action, filed on December 10, 2021, Dkt. # 58-2, after this Court's decision in Plaintiffs' first appeal.

- "Opinion Denying Leave to Amend" means the district court's March 31, 2023 opinion denying Plaintiffs' post-appeal motion for leave to amend. Dkt. # 76.

- "Plaintiffs" are Plaintiffs-Appellants Darrell Wilcox and Michael McGuire.

- "Plans" or "Georgetown University Plans" refers to the Georgetown University Defined Contribution Retirement Plan (the "DC Plan") and the Georgetown University Voluntary Contribution Retirement Plan (the "Voluntary Plan") collectively.

- "TIAA" means Teachers Insurance and Annuity Association of America.

- "Voluntary Plan" refers to the Georgetown University Voluntary Plan.

## I.    STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

**1.**    Did the district court err when it denied as futile Plaintiffs' motion for leave to amend their Complaint when dozens of courts, including the Supreme Court in *Hughes v. Northwestern Univ.*, 142 S. Ct. 737 (2022), have held that similar allegations in factually indistinguishable cases state cognizable claims for breaches of ERISA's fiduciary duty provisions?

**2.**    Did the district court err when it ruled that Plaintiffs' factual allegations comparing fees paid by the Georgetown University Plans for recordkeeping and administrative services to those paid by similar plans that describing survey data collected by a nationally recognized consulting firm, were insufficient?

**3.**    Did the district court err when it held that Plaintiffs' allegations that Defendants' failure to obtain or provide accurate information about the Plans' fees to participants in the Plans' Form 5500 annual reports and failed to obtain accurate fee information in violation of ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) and 29 C.F.R. § 2550.408b-2 did not establish violations of ERISA's fiduciary duty of candor and ERISA's prohibited transaction rules?

1

**4.** Did the district court err when it ruled that Plaintiffs lack standing to challenge both (i) the fees related to certain Vanguard fund offerings in the Plans, and (ii) that Plaintiffs lacked standing to challenge illegal transfer restrictions in the TIAA Traditional Annuity, a fund in which Plaintiff Wilcox invested, because Plaintiffs did not allege that he had attempted to transfer out of the Traditional Annuity, despite being prohibited from transferring his money out of the Traditional Annuity by the terms of the illegal transfer restrictions?

## II.    STATEMENT OF THE CASE

### A. FACTUAL BACKGROUND

Plaintiffs are participants in two Georgetown University retirement plans, the DC Plan and Voluntary Plan,[1] which are participant directed, defined contribution pension plans covered by and subject to ERISA. *See* Plaintiffs' proposed First Amended Complaint – Class Action (the "FAC"), dated December 10, 2021, Dkt. # 58-2, at ¶¶ 1, 3, 35, 39-40. The Plans are 403(b) plans which, much like 401(k) plans,

---

[1] Plaintiffs have asserted the claims in this action on behalf of, and for the benefit of, the Plans. *Id.* ¶ 1.

allow employees to direct a portion of their salaries into individual accounts and then invest those retirement savings into a menu of investment options selected by the Plans' fiduciaries.[2] *Id*. ¶¶16-17, 42-46.

Plaintiffs allege that Defendants, who are fiduciaries of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their ERISA mandated duties to prudently and loyally select and monitor the third-party companies who serviced the Plans, as well as the investment alternatives from which the participants could allocate their retirement savings. *Id*. ¶¶ 3-4, 41-45; *see also Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 741 (2022); *Tibble v. Edison Int'l*, 575 U.S. 523 (2015).[3] Plaintiffs allege that the Defendants' fiduciary breaches caused the Plans to pay excessive compensation to third parties, to the detriment of the Plans and their participants.

_____

[2] 403(b) plans differ from 401(k) plans primarily in that they can only be offered by public schools, certain tax-exempt charitable organizations, and certain faith-based organizations.

[3] ERISA's fiduciary duties are the "highest duties known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 602 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (Friendly, J.)).

### 1.    The Plans Paid Excessive Recordkeeping Fees

As Plan fiduciaries, Defendants were responsible for selecting and monitoring the Plans' recordkeepers, third-party vendors that keep track of plan participants and their accounts. FAC ¶ 4. Rather than selecting a single recordkeeper, Defendants engaged three of them -- TIAA, Vanguard, and Fidelity. *Id*. ¶¶ 17, 79-83. As a result, there were three companies being paid unnecessary and excessive fees by the Plans for performing duplicative services. *Id*. ¶¶ 13, 103.

In addition to engaging three firms to do the work of one, Defendants also failed to properly monitor and evaluate the compensation that TIAA received for recordkeeping and administrative services as required by ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) and its associated regulation, 29 C.F.R. § 255.408b-2(c). *Id*. ¶¶ 6-8, 30-31. The FAC describes in detail that the compensation both Plans paid TIAA included both direct payments to TIAA and indirect compensation generated from fees assessed on TIAA's proprietary investment offerings: (i) the TIAA Traditional Annuities, (ii) eight variable annuities (the "Variable Annuities") provided by TIAA affiliates; (iii) and the TIAA Real Estate Account. *Id*. ¶¶ 10-11.

4

Plaintiffs allege that the fees TIAA received for recordkeeping "greatly exceeded a reasonable fee for comparable services" *id*. ¶ 10, as TIAA's compensation was exorbitant. In 2012, for example, TIAA received at least $1.72 million in compensation for recordkeeping and administrative services for the DC Plan, or roughly $267 per participant. *Id*. ¶ 12. By 2014, TIAA's compensation for recordkeeping was more than $1.44 million or $196 per participant. *Id*. ¶ 13. According to studies cited in the FAC that were conducted by NECP, LLP (an independent, nationally recognized, full-service investment consulting firm), reasonable per participant fees for such services would have been roughly $92 and $70 in 2012 and 2014, respectively. *Id*. ¶¶ 12-13. By 2016, according to NECP, LLC, an independent investment consulting firm, median recordkeeping fees for defined contribution plans with $1 billion in assets had plummeted to $37 per participant. *Id*. ¶ 12. Despite the industry-wide decline in service fee costs, the DC Plan paid TIAA fees of $1.263 million for a per participant average of $184 in 2016, nearly five times more than the median found by NEPC. *Id*. ¶ 15.

Defendants also permitted the Plans to pay duplicative recordkeeping fees to two other recordkeepers – Vanguard and Fidelity –

whom Defendants hired in addition to TIAA to provide the same recordkeeping services to the Plans. *Id*. ¶ 17, 79-83.

While Plaintiffs' original Complaint alleged these violations, the proposed FAC supplements those claims with allegations providing additional details concerning Defendants' failure to understand and control the asset-based compensation[4] paid to the Plans' recordkeepers. Specifically, the FAC alleges that in 2017, the Plans offered retail shares of 87 Vanguard mutual funds, which generated approximately $210,000 of excess asset-based compensation to Vanguard, one of the Plans' additional recordkeepers. As the FAC explains, those fees could have been saved had Defendants selected lower cost institutional share classes

---

[4] Asset-based fees are a way to compensate companies that provide investment services based on the value of a plan's assets under management. In other words, the company charges and receives higher compensation based on the size of the investment portfolio, rather than a flat fee. Revenue sharing is the practice of adding non-investment related fees to the expense ratio of an investment option in a retirement plan such as a 401(k) or 403(b) plan. Those fees are bundled into the expense ratio of the plan's investment options and are reported to plan participants as investment costs, but instead of going to the investment company which is managing the particular investment, the revenue sharing fees are given to the plan's recordkeeper in addition to any compensation the recordkeeper may be paid directly by the plan and/or plan participants.

of exactly the same funds. *Id.* In 2020, the Plans continued to offer retail shares of 31 Vanguard funds, which generated about $275,000 in completely unnecessary asset-based compensation to Vanguard compared to lower-cost institutional shares of the same funds. *Id.* at ¶ 18.

Defendants also failed to benchmark TIAA's fees against the fees charged by the Plans' other recordkeepers for providing virtually identical services to the same Pans. *Id.* ¶ 20. For instance, in 2014, while TIAA was collecting $280 per participant, Vanguard was charging $114 per participant for recordkeeping services. *Id.*¶¶ 20, 30 (DC Plan participants paid excessive recordkeeping and administration fees in the range of $300 per participant, and Voluntary Plan participants paid roughly $175 per participant). Critically, Plaintiffs could not perform a similar comparison of recordkeeping fees paid to Fidelity because Defendants failed to obtain required disclosures pursuant to ERISA 408(b)(2) concerning the indirect compensation received by Fidelity and they failed to properly report such compensation in the Plans' Annual Reports on Forms 5500. *Id.* ¶¶ 21-22, 105-110.

7

The excessive compensation paid to multiple recordkeepers has continued until at least 2020, when just one of the Plans paid approximately $1.85 million in recordkeeping and administrative expenses to TIAA and Vanguard for an average of $145 per participant. *Id.* ¶ 24. These figures do not include additional compensation paid to Fidelity for recordkeeping. *Id.* By comparison, the FAC points out that the University of Chicago retirement plans, with aggregate assets of approximately $2.4 billion, in 2020 cut recordkeeping fees to $21-$44 per participant. *Id.* ¶¶ 27, 85. Thus, a flat annual recordkeeping fee of $35 per participant would have been reasonable and readily available to the Plans during the Class Period. *Id.* ¶¶ 67.

Finally, the FAC includes new allegations supporting the imprudence of maintaining multiple recordkeepers by providing examples of six other university 403(b) plans that consolidated recordkeeping with one service provider. *Id.* ¶¶ 79-104. The FAC contains detailed allegations concerning the successful consolidation of 403(b) recordkeeping by the University of Chicago, Loyola Marymount University, Pepperdine University, Purdue University, California Institute of Technology, and the University of Notre Dame. *Id.* The FAC

8

cites as additional support studies by independent consultants like Aon Hewitt and Towers Watson, establishing the cost savings and other advantages of recordkeeper consolidation. *Id*.

### 2. The Plans Maintained Imprudent Investments

Plaintiffs also allege that Defendants breached their ERISA duty of prudence by failing to exercise sufficient diligence to understand and monitor the investment options offered to the Plans' participants. *Id*. ¶ 29. Defendants' imprudence is exemplified by the overwhelming number of investment choices offered in the Plans, which include fixed and variable annuities from TIAA,[5] more than 80 Vanguard mutual funds, and approximately 190 Fidelity mutual funds. *Id*. ¶¶ 46-47, 73-78. Defendants failed to properly monitor and evaluate the performance and fees of the Plans' nearly ***400 investment options***. Instead, by offering hundreds of investments, Defendants attempted to shift the Plans' participants the responsibility to determine the prudence of these offerings. *Id*. ¶¶ 75-77.

---

[5] The TIAA Traditional Annuity is a fixed annuity contract. The so-called variable annuities are the CREF Stock Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, CREF Social Choice Account, CREF Global Equities Account, CREF Growth Account, CREF Equity Account, and CREF Bond Market Account. FAC ¶¶ 48-49.

Defendants failed to apprehend that the fees TIAA charged on its fixed and variable annuity invests were unreasonable and excessive. The FAC describes in detail the multiple layers of expenses charged on the CREF variable annuities, which included (i) an "administrative expense" charge (24 – 26 bps); (ii) an "12b-1 distribution expense" charge (7.5 – 11.5 bps); and (iii) an "investment management expense" charge (ranging from 4 to 15 bps). *Id.* ¶¶ 51, 56-59. Additionally, TIAA charged an additional fee of 0.5 basis points as a mortality and expense charge for each of the Variable Annuities included as investment choices in the Plans, even though the prospectuses for the Variable Annuities revealed that these "annuities" do not bear any mortality risk. *Id.* ¶¶ 25, 54-55. Rather, the Variable Annuities transferred the mortality risk to the participants. *Id.* ¶ 26. These charges were unreasonable and excessive because there is nothing unique about the variable annuities – as the FAC explained, they are simply pools of assets that offer participants a vehicle for collective investment, just like lower cost mutual funds and collective investment trusts. *Id.* ¶ 53. TIAA also received significant additional compensation based on the difference (or "spread") between what it earned investing the money participants invested in the TIAA

10

Traditional Annuity and the amounts TIAA chose to credit to participant accounts, and more still in loan servicing fees. *Id*. ¶¶ 20 n.9, 23.b.

The FAC also alleges that the TIAA Traditional Annuity was imprudent because it imposes upon the Plans' participants a 10-year lock-up period for withdrawals, during which withdrawals would only be paid in 10 annual installments, and, in a short window after retirement, allowed immediate withdrawals but only if the participant paid a 2.5% surrender charge. *Id*. ¶¶ 60, 117-126. This 2.5% surrender charge and the 10-year lock-up make the Traditional Annuity less valuable for all participants, regardless of whether they have yet to pay the surrender charge or suffer the loss of opportunity due to the 10-year lock-up. *Id*. ¶ 60.

Many of the investment options available to the Plans' participants were available in less expensive share classes, which, as explained above, provided the same investments at significantly lower cost. *Id*. ¶¶ 14-15, 17-18, 111-116. The Plans, each with more than $1 billion to invest, qualified for the least expensive, institutional-grade share classes of every fund in their portfolio. *Id*. Defendants' failure to obtain the least expensive share classes piled on completely unnecessary fees for the

Plans' participants. *Id.* These asset-based fees caused the fees participants paid for recordkeeping and administrative services to steadily increase based on the amount of assets in the Plans, without any additional services being provided or any change to the cost of providing those services. *Id.* ¶ 19. Had Defendants performed even basic service or investment fee benchmarking, they would have learned how much the Plans' participants paid out of their retirement savings in fees compared to comparable plans—but Defendants failed to perform or obtain any benchmarking. *Id.* ¶ 20.

Defendants failed to leverage the Plans' significant bargaining power of their more than $1 billion in assets and failed to monitor and control the costs paid by the Plans' participants, in breach of ERISA's fiduciary duties. By failing to obtain and provide accurate information about the fees and costs of the Plans' investments, as the FAC explains, Defendants engaged in prohibited transactions for which there is no exemption and breached their fiduciary duty of candor to the Plans' participants. These violations of ERISA's fiduciary duties and prohibited transaction rules cost the Plans' participants millions of dollars of retirement savings every year—the impact of which was magnified by

12

the lost compounding investment returns participants would have received had the Plans been prudently managed.

## B. PROCEDURAL HISTORY

On February 23, 2018, Plaintiffs filed their initial class action Complaint alleging Defendants breached their fiduciary duties to Plaintiffs and the Plans. Dkt. # 1. On January 8, 2019, the district court issued its Motion to Dismiss Opinion granting Defendants' motion to dismiss the original Complaint "without prejudice." Dkt. # 35. The district court held that Plaintiffs lacked standing with respect to certain claims and identified certain other perceived factual pleading deficiencies in the Complaint. *Id.*

Within thirty days of the issuance of the Motion to Dismiss Opinion, Plaintiffs filed a motion seeking leave to file an amended complaint. Dkt. # 37. Defendants filed an opposition to Plaintiffs' Motion on March 7, 2019, asserting that the Motion to Dismiss Opinion was a final appealable order, that moving for reconsideration was Plaintiffs' only procedural option short of appealing, and that since Plaintiffs' motion was not filed within the 28 days required by F.R.C.P. 59(e), the district court had no jurisdiction to entertain the motion for leave to amend. Dkt.

# 39.

On May 29, 2019, without addressing the merits of the proposed amended complaint, the district court denied Plaintiffs' motion for leave to amend, contending that the dismissal without prejudice was a final appealable judgment. Dkt. # 43. Plaintiffs filed a notice of appeal on June 27, 2019. Dkt. # 45.

On August 16, 2019, Defendants filed a motion to dismiss the appeal as untimely. On February 9, 2021, after briefing and oral argument, this Court denied Defendants' motion to dismiss the appeal as untimely. *Wilcox v. Georgetown Univ.*, 987 F.3d 143 (D.C. Cir. 2021). The Court also vacated the district court's denial of Plaintiffs' motion for leave to amend and remanded the case to the district court, finding among other things that the Motion to Dismiss Opinion on its face dismissed the "complaint" without prejudice, and that the district court's "comments highlighted the absence of particular facts that would have supported appellants' theory. That is the sort of problem that could potentially be cured by an amended complaint." *Id.* at 150.

14

On December 10, 2021, Plaintiff's filed a motion for leave to file a first amended complaint. Plaintiff's motion included the proposed FAC. Dkt. # 58-2.

Despite this Court's direction specifically contemplating an amended complaint, on March 31, 2023, the district court denied Plaintiffs' motion for leave to amend. *See* Dkt. # 76 (the "Opinion Denying Leave to Amend"). Instead of independently evaluating the allegations and the relevant law, the district court's Opinion Denying Leave to Amend simply readopted the holdings and rationale of the Motion to Dismiss Opinion.

Plaintiffs timely filed a notice of appeal of the district court's Opinion Denying Leave to Amend on April 28, 2023.

## III.    SUMMARY OF THE ARGUMENT

Contrary to Supreme Court precedent and the decisions of dozens of other courts that have considered similar cases, the district court has twice erroneously ruled that Plaintiffs' allegations describing Defendant's fiduciary breaches are insufficient: once when it dismissed the Complaint, and again after this Court reversed the district court's first opinion when it denied Plaintiffs' Motion for Leave to Amend. Both

15

times, the district court made fundamental errors in assessing the sufficiency of Plaintiffs' factual allegations and evaluating Plaintiffs' standing.

The detailed allegations in the FAC state claims for breach of fiduciary duties and prohibited transactions under the Supreme Court's decision in *Hughes v. Northwestern Univ.*, 142 S.Ct. 737 (2022) and *Tibble* v. *Edison Int'l*, 575 U.S. 523, 530 (2015). Numerous appellate and district court decisions around the country have denied motions to dismiss in similar ERISA cases involving allegations concerning mismanagement of the retirement plans similar to the allegations in the FAC. *See infra* nn.7, 11. The FAC alleges that participants in the Plans paid exorbitant recordkeeping and service fees as well as investment managements fees, far out of proportion to the services they received, far higher than the fees paid by other comparable university plans that provided the same investments diligently managed plan expenses, and far above what an institutional investor with more than $1 billion in assets (such as the Plans here) should have paid for those investments and services. In addition, the district court's rejection of Plaintiffs' claims for violations of ERISA's prohibited transaction rules for the insufficient

16

fee disclosures Defendants obtained and provided to participants is inconsistent with the Ninth Circuit's recent decision in *Bugielski v. AT&T Servs.*, No. 21-56196, --- F.4th ---, 2023 U.S. App. LEXIS 20113, at *12-18 (9th Cir. Aug. 4, 2023).

The district court's opinion ruling that Plaintiffs' lack Article III standing to assert claims about certain funds offered to the Plans that neither of the Plaintiffs personally invested in is contrary to the Third Circuit's decision in *Boley v. Universal Health Servs.*, 36 F.4th 124 (3d Cir. 2022). The district court also failed to evaluate Plaintiffs' claims for declaratory and injunctive relief under 29 U.S.C. § 1132(a)(3) with respect to the TIAA Traditional Annuities (in which Plaintiff Wilcox did invest) and failed to apply the standard that numerous other circuit courts of appeal have applied in assessing the standing requirements in claims seeking injunctive relief under § 1132(a)(3). Ultimately, the district court's rulings as to standing make no sense as a practical or legal matter, and if this Court were to adopt them, they would open numerous circuit splits, going against every reported decision to have consider these standing issues.

In short, the district court's Opinion Denying Leave to Amend is fatally flawed and legally unsustainable from top to bottom, and should be reversed and remanded with instructions to allow Plaintiffs to file their FAC.

## IV.   LEGAL STANDARD

Leave to amend "shall be freely given when justice so requires," and the ability to dismiss without granting leave to replead is "severely restricted by command of Rule 15(a)." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1083–84 (D.C. Cir. 1998) (internal quotes and citation omitted). Indeed, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman*, 371 U.S. at 182; *see also Caribbean Broadcasting System, Ltd.*, 148 F.3d at 1084 (courts adhere to "the policy in favor of hearing cases on their merits"). In this case, Plaintiffs' complaint was dismissed without prejudice, but the district court has steadfastly refused to allow Plaintiffs the opportunity to amend their complaint.

It is an abuse of a district court's discretion to deny leave to amend "unless there is sufficient reason, such as 'undue delay, bad faith or

dilatory motive ... repeated failure to cure deficiencies by [previous] amendments ... [or] futility of amendment.'" *Firestone*, 76 F.3d at 1208 (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). If leave to amend is denied because of "perceived deficiencies of those complaints under Rules 12(b)(1) and 12(b)(6)[,]" review is "*de novo*[.]" *Osborn v. Visa Inc.*, 797 F.3d 1057, 1062 (D.C. Cir. 2015).

When evaluating a claim of breach of fiduciary duty under ERISA, Plaintiffs are not required to rule out every potentially prudent explanation for Defendants' imprudent decisions or in the fact that participants may be able to choose their investments within a plan's menu. *See Hughes v. Northwestern Univ.*, 142 S.Ct. 737 (2022) ("*Hughes I*"). In *Hughes I*, Supreme Court expressly reemphasized their ruling in *Tibble* v. *Edison Int'l*, 575 U.S. 523, 530 (2015), that "[i]f the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." 142 S. Ct. 738-39.

On remand after the Supreme Court's decision in *Hughes II*, the Seventh Circuit articulated the correct standard of review in *Hughes v. Northwestern Univ.*, 63 F.4th 615 (7th Cir. 2023) ("*Hughes II*"), *on remand from Hughes I,* 142 S. Ct. 737, recognizing that "[o]ther circuits

are in accord that every possible alternative explanation for an ERISA fiduciary's conduct need not be ruled out at the pleadings stage." *Hughes II*, 63 F.4th at 629 (citing *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 108 (2d Cir. 2021); *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020); *Sweda v. Univ. of Pa.*, 923 F.3d 320, 326 (3d Cir. 2019); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 (8th Cir. 2009)).

Specifically, in *Hughes II* the Seventh Circuit clarified that the heightened pleading standard articulated in *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014), requiring plaintiff to plausibly allege "an alternative action that the defendant could have taken … that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it," is only applicable to cases involving employee stock ownership plans ("ESOPs"). In non-ESOP cases, however, the more relaxed plausibility standard articulated in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) applies. *Hughes II*, 63 F.4th 615. The Seventh Circuit held that "[t]o plead a breach of the duty of prudence under ERISA, a plaintiff must plausibly allege fiduciary decisions outside a range of reasonableness." *Hughes II*, 63 F.4th 615 (citing *Hughes*, 211 L. Ed. 2d

20

558). "[T]hat range of reasonableness will depend on the circumstances … prevailing at the time the fiduciary acts." *Id.* (citation and internal quotation omitted). Moreover, "'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable…' At the pleading stage, a plaintiff must provide enough facts to show that a prudent alternative action was plausibly available, rather than actually available." *Id*. at 630 (quoting *Bell Atlantic Corp.*, 550 U.S. at 556).

At the motion to dismiss stage, Plaintiffs' allegations must be accepted as true. The district court erred not only by considering Defendants' factual characterizations but by accepting them. At the motion to dismiss stage, the district court "must take all facts alleged in the complaint as true and make all reasonable inferences in plaintiffs' favor." *Doe #1 v. Am. Fed'n of Gov't Emps.,* 554 F. Supp. 3d 75, 92 (D.D.C. 2021) (citing *Humane Soc'y of the U.S. v. Vilsack,* 797 F.3d 4, 8 (D.C. Cir. 2015)). Defendants' disagreement with and attempt to refute Plaintiffs' allegations should have been disregarded as issues properly raised on summary judgment or subsequently in the litigation. *See generally Cavalier v. Catholic Univ. of Am.*, 306 F. Supp. 3d 9, 35 (D.D.C. 2018)

21

(acknowledging that while the defendant might prevail on summary judgment, the denial of a motion to dismiss was appropriate because there was a factual dispute regarding the reasonableness of the defendant's behavior).

## V.   ARGUMENT

### A. The District Court's Denial of Leave to Amend and its Opinion Dismissing the Original Complaint is Contrary to *Hughes v. Northwestern Univ.* ("*Hughes I*"), 142 S. Ct. 737 (2022).

Plaintiffs in this case allege that Defendants violated their ERISA fiduciary duty of prudence, see ERISA § 404(a), 29 U.S.C. § 1104(a). The Supreme Court explained in *Hughes I*:

> [*Tibble v. Edison Int'l*, 575 U.S. 523 (2015)]'s discussion of the duty to monitor plan investments applies here. Petitioners allege that respondents failed to monitor the Plans' investments in a number of ways, including by retaining recordkeepers that charged excessive fees, offering options likely to confuse investors, and neglecting to provide cheaper and otherwise-identical alternative investments. As a result, respondents allegedly failed to remove imprudent investments from the Plans' offerings. These allegations must be considered in light of the principles set forth in *Tibble* to determine whether petitioners have stated a plausible claim for relief.

142 S. Ct. at 741. Thus "plan fiduciaries are required to conduct their own independent evaluation to determine which investment may be prudently included in the plan's menu of options" and "[i]f the fiduciaries

fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Id*. at 742 citing *Tibble*, 575 U.S. at 529-530. Further, plan fiduciaries "[have] a continuing duty to monitor…investments and remove imprudent ones." *Id*. at 741. "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id*. at 741. The district court's decision denying leave to amend the Complaint ignores the Supreme Court's decision in *Hughes I* and its command to apply the standards set forth in *Tibble* and should be reversed.

Here, Plaintiffs' FAC alleges that Defendants breached their fiduciary duties by (among other things) (i) failing to monitor the Plans' investments; (ii) retaining Plan service providers that charged excessive recordkeeping fees to participants; and (iii) failing to provide otherwise identical but cheaper share classes of the Plans' investment option to participants. FAC Counts I & II, ¶¶ 136-150.

In addition to *Hughes*, which involved the ERISA plans offered by Northwestern University, federal courts have overwhelmingly refused to dismiss similar class action lawsuits filed against other large universities

23

whose plan participants challenged similar imprudent practices by plan

fiduciaries.[6] The claims alleged in the FAC are substantially similar to

the claims in those other cases, namely that (i) Defendants failed to

control expenses for recordkeeping and administrative services[7]; (ii)

---

[6] *See Moler v. Univ. of Maryland Med. Sys.*, No. 1:21-CV-01824-JRR, 2022 WL 2756290, at *7 (D. Md. July 13, 2022) (denying motion to dismiss breach of fiduciary duty claims alleging the defendants selected and failed to remove imprudent invest options and excessive recordkeeping fees); *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344 (N.D. Ga. 2017) (plaintiffs stated claim against fiduciaries for breach of duty of prudence); *Cunningham v. Cornell Univ.*, No. 16-CV-6525 (PKC), 2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) (same); *Kelly v. Johns Hopkins Univ.*, No. CV GLR-16-2835, 2017 WL 4310229 (D. Md. Sept. 28, 2017) (same); *Daugherty v. Univ. of Chicago*, No. 17 C 3736, 2017 WL 4227942 (N.D. Ill. Sept. 22, 2017) (same); *Short v. Brown Univ.*, No. 17-318 (D.R.I. July 2018) (same); *Nicolas v. Trustees of Princeton Univ.*, No. CV 17-3695, 2017 WL 4455897 (D.N.J. Sept. 25, 2017) (same); *Clark v. Duke Univ.*, No. 1:16-CV-1044, 2017 WL 4477002 (M.D.N.C. May 11, 2017) (same); *Cates v. Trustees of Columbia Univ. in City of New York*, No. 16-CV-6488 (KBF), 2017 WL 3724296 (S.D.N.Y. Aug. 28, 2017) (denying, in part, motions to dismiss); *Tracey v. Massachusetts Inst. of Tech.*, No. CV 16-11620-NMG, 2017 WL 4478239 (D. Mass. Oct. 4, 2017); *Sacerdote v. New York Univ.*, No. 16-CV-6284 (KBF), 2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) (same); *Cassell v. Vanderbilt Univ.*, No. 3:16-cv-02086 (M.D. Tenn. Jan. 5, 2018) (same); *Santiago v. Univ. of Miami*, 20-cv-21784 (same); *Munro v. Univ. of S. California*, No. 2:16-CV-06191-VAP-EX, 2019 WL 4543115 (C.D. Cal. Aug. 27, 2019) (same); *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673 (D. Conn. 2018) (same).

[7] *See e.g., Moler*, 2022 WL 2756290, at *6 (D. Md. July 13, 2022) (denying motion to dismiss breach of fiduciary duty claims alleging the defendants selected and failed to remove imprudent invest options and excessive

Defendants included "a very large number of investment alternatives in its portfolio and then shift[ed] to the participants the responsibility for choosing among them … result[ing] in the inclusion of many investment alternatives that a responsible fiduciary should exclude," *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009); (iii) Defendants maintained multiple recordkeepers resulting in duplicative and excessive administrative expense;[8] and (iv) Defendants selected and retained an investment option from which participants could not withdraw their savings except in ten annual installments and denying them the

---

recordkeeping fees); *Cunningham*, 2017 WL 4358769, at *6 (S.D.N.Y. Sept. 29, 2017); *Nicolas*, 2017 WL 4455897, at *4 (D.N.J. Sept. 25, 2017); *Tracey*, 2017 WL 4478239, at *2 (D. Mass. Oct. 4, 2017); *Munro*, 2019 WL4543115 (C.D. Cal. Aug. 27, 2019) (same); *Vellali*, 308 F. Supp. 3d 673 (D. Conn. 2018); *Short*, 320 F. Supp. 3d 363, 370 (D.R.I. 2018); *Cassell*, 285 F. Supp. 3d 1056, 1064 (M.D. Tenn. 2018); *Santiago*, 2021 WL 1173164, at *6 (S.D. Fla. Mar. 1, 2021), *report and recommendation adopted,* 2021 WL 1165441 (S.D. Fla. Mar. 26, 2021).

[8] *See e.g., Henderson*, 252 F. Supp. 3d at 1353 finding plaintiffs stated claim against fiduciaries for breach of duty of prudence based on maintaining three recordkeepers); *Cunningham*, 2017 WL 4358769, at *6; *Nicolas*, 2017 WL 4455897, at *4; *Short*, 320 F. Supp. 3d at 370; *Cassell*, 285 F. Supp. 3d at 1065; *Santiago*, 2021 WL 1173164, at *6.

opportunity to move to better performing investment options, in violation of an explicit ERISA rule.[9]

The handful of cases granting motions to dismiss entirely have largely been reversed, most notably, by the Supreme Court in *Hughes I*.[10] Another case in which a court granted a motion to dismiss, *Sweda v. Univ. of Penn.*, 16-cv-4329, 2017 WL 4179752 at *10 (E.D. Pa. Sept. 21, 2017), *rev'd in part*, 923 F.3d 320 (3d Cir. 2019), is particularly notable because the district court here relied on the district court decision in *Sweda* as part of its rationale for dismissing Plaintiffs' original

---

[9] *See e.g., Moler*, 2022 WL 2756290, at *2-6; *Henderson*, 252 F. Supp. 3d at 1352; *Cunningham*, 2017 WL 4358769, at *8; *Kelly v. Johns Hopkins Univ.*, 2017 WL 4310229 (D. Md. Sept. 28, 2017); *Daugherty v. Univ. of Chicago*, 2017 WL 4227942 (N.D. Ill. Sept. 22, 2017); *Nicolas*, 2017 WL 4455897, at *4-5; *Clark v. Duke Univ.*, 2017 WL 4477002 (M.D.N.C. May 11, 2017); *Cates v. Trustees of Columbia Univ. in City of New York*, 2017 WL 3724296 (S.D.N.Y. Aug. 28, 2017); *Munro,* 2019 WL 4543115; *Short*, 320 F. Supp. 3d at 372.

[10] *Divane v. Northwestern Univ.*, 953 F.3d 980 (7th Cir. 2020), *vacated and remanded sub nom. Hughes I,* 142 S. Ct. 737, and *opinion reinstated in part, Hughes II*, 63 F.4th 615; *see also Sweda v. Univ. of Pennsylvania*, No. CV 16-4329, 2017 WL 4179752 (E.D. Pa. Sept. 21, 2017), *aff'd in part, rev'd in part and remanded,* 923 F.3d 320 (3d Cir. 2019) (motion to dismiss granted, but reversed by the Third Circuit); *Davis v. Washington Univ. St Louis,* No. 4:17-CV-1641 RLW, 2018 U.S. Dist. LEXIS 167594 (E.D. Mo. Sept. 28, 2018), *aff'd in part, rev'd in part and remanded*, 960 F.3d 478 (8th Cir. 2020).

Complaint. *See* Motion to Dismiss Opinion, at 23 (citing 2017 WL 4179752 at *10 (E.D. Pa. Sept. 21, 2017)). However, *Sweda* was subsequently reversed by the Third Circuit on appeal, in pertinent part. *See* 923 F.3d 320 (3d Cir. 2019). Even though Plaintiffs pointed the reversal out to the district court in briefing on the motion for leave to amend, Dkt. No. 58-1, at 4 n.2, the district court never acknowledged or dealt with its reliance on overruled case law.

Nor did the district court, in denying Plaintiffs' motion for leave to amend, acknowledge (i) the Supreme Court's "guidance" in *Tibble,* as the Supreme Court faulted the Seventh Circuit for failing to do in *Hughes I*, 142 S. Ct. at 738; or (ii) the numerous cases that rejected the district court's approach, cited above. Instead, the district court minimized Plaintiffs' detailed allegations as "appear[ing] to be a lawsuit in search of a theory…" Opinion Denying Leave to Amend, at 2. As can be clearly seen by the refusal of the Supreme Court and numerous other courts to dismiss similar claims involving university sponsored 403(b) plans, the district court was obviously mistaken.

Contrary to the district court's characterization, Plaintiffs' claims are robust, detailed, and are substantively identical to claims that have

27

been approved by numerous courts, including the Supreme Court of the United States. Nevertheless, the district court has rejected Plaintiffs' claims three times, on increasingly strained grounds each time—and has itself already been reversed once by this Court for doing so. After its prior decision was reversed by this Court, it took the district court more than a year to deny Plaintiffs' motion for leave to amend and, then when it did, it failed to address the most recent and pertinent Supreme Court case, *Hughes I*, which dealt with nearly identical issues addressing the sufficiently of alleged claims for breach of the fiduciary duty of prudence related to the management of a 403(b) plan. This Court should reverse the district court's denial of Plaintiffs' motion for leave to amend and should remand this case to the district court with instructions to allow Plaintiffs to file the FAC.

> **1.    The FAC's Allegations Regarding Other University Plans Support Plaintiffs' Excessive Fees Claims**

In the initial Complaint, Plaintiffs alleged that the recordkeeping fees paid by the Plans were not reasonable, and that Defendants breached their fiduciary duties by retaining three recordkeepers (TIAA, Vanguard and Fidelity), who provided duplicative services for which the

Plans were charged needless additional expense. Complaint, Dkt. 1, at Counts I & II, ¶¶ 191-137. In response to Defendants' motion to dismiss, the district court found Plaintiffs' allegations that having three duplicative recordkeeping companies was deficient because Plaintiffs did not provide sufficient support for their contention that a single recordkeeper could have provided the same service across the three platforms for a fixed fee in the range of $35 per year for each participant. *See* Opinion Denying Leave to Amend, at 24-25. In particular, the Court faulted the original Complaint because it did not contain any allegations identifying university retirement plans that use a single recordkeeper for investment choices offered by multiple fund managers. *Id.* at 25. The district court also found that because Georgetown's 403(b) plans offered both long-term annuities and short-term investments, it would not be possible to consolidate recordkeeping by a single entity. *Id.* at 25–26.

The FAC specifically cured these purported "deficiencies." The FAC alleges that numerous private university 403(b) plans that include as investment options both annuities and mutual funds have been able to save millions of dollars by consolidating recordkeeping with a single service provider. Specifically, the FAC cites real world examples of such

29

consolidations, including the LMU 403(b) defined contribution plan (¶¶ 87-91), the Pepperdine University 403(b) plan (¶¶ 92-95), the Purdue University 403(b) plan (¶ 96), the California Institute of Technology TIAA-CREF DC Retirement Plan (¶¶ 97-98), the University of Notre Dame 403(b) plan (¶¶ 99-101), and the University of Chicago 403(b) plan (¶¶ 17, 54, 86).

Despite these additional, fulsome allegations, the district court again found them to be insufficient, ostensibly because they do include details regarding the scope and quality of the services being provided. Opinion Denying Leave to Amend, at 26. This holding runs afoul of decisions from the majority of courts that have considered the same issue, which have found similar allegations satisfy the plausibility standard. Indeed, in *Hughes II*, the Seventh Circuit recently upheld plaintiffs' recordkeeping fee claims, noting that "[a] court's role in evaluating pleadings is to decide whether the plaintiff's allegations are plausible— not which side's version is more probable." *Id.* at 630.

The Seventh Circuit further noted "[t]he Third Circuit in *Sweda* and the Second Circuit in *Sacerdote*—as well as the other circuits cited above—rejected the reading of *Twombly* and *Iqbal* that Northwestern

30

advances here." *Id*. at 629. *See also Brown v. MITRE Corp*., 2023 WL 2383772, at *5 (D. Mass. Mar. 6, 2023) (holding "the First Circuit has not 'foreclosed plaintiffs' complaint.'"); *Coppel v. SeaWorld Parks & Ent., Inc.*, 2023 WL 2942462, at *14 (S.D. Cal. Mar. 22, 2023) (listing ERISA excessive fee claims citing comparator plans paying less in fees and holding, "[d]istrict courts in the Ninth Circuit have repeatedly found allegations like these sufficient to state a claim of imprudence based on excessive recordkeeping fees.").

The Seventh Circuit explicitly distinguished *Smith v. CommonSpirit Health*, 37 F.4th 1160 (6th Cir. 2022) and *Albert v. Oshkosh Corp*., 47 F.4th 570 (7th Cir. 2022) upon which the district court relied, distinguishing the *Hughes* plaintiff's claims from *Albert* and *Smith*, holding that the plaintiffs adequately pled that the recordkeeping fees were excessive relative to the services rendered:

> Unlike in *Albert*, plaintiffs here assert '[t]here are numerous recordkeepers in the marketplace who are *equally* capable of providing a high level of service to large defined contribution plans like the Plans.' So, plaintiffs maintain that the quality or type of recordkeeping services provided by competitor providers are comparable to that provided by Fidelity and TIAA. **Plaintiffs also plead that because recordkeeping services are 'commoditized … recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to**

> **win the business, particularly for jumbo plans like the Plans.'** In short, plaintiffs allege that recordkeeping services are fungible and that the market for them is highly competitive. Plaintiffs also contend that $35 per participant was a reasonable recordkeeping fee based on the services provided by existing recordkeepers and the Plans' features. **Unlike the plaintiffs in *CommonSpirit Health*, plaintiffs plead that the fees were excessive relative to the recordkeeping services rendered. *See* 37 F.4th at 1169.**

*Hughes*, 63 F.4th at 632 (emphasis added). Here, Plaintiffs easily satisfy the pleading requirement of *Albert* and *Smith* as clarified by the Seventh Circuit in *Hughes*. As in *Hughes*, Plaintiffs allege, "Recordkeeping is a necessary service for every defined contribution retirement plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace capable of providing a high level of service to large defined contribution plans like the Plans. These recordkeepers primarily differentiate themselves based on price and vigorously compete for business by offering the best price." FAC ¶62.

Further, "[t]he cost of recordkeeping and administrative services depends on the number of retirement plan participants, the number of investment choices, the complexity of plan features and similar factors that generally do not vary greatly over time. The actual cost of those services does not turn on the asset balance of a retirement plan or the

amount of savings held in a particular plan participant's account." *Id.* ¶64. Specific details regarding the recordkeeping and administrative services provided is also unnecessary at this stage of the litigation. *See, e.g., Brown v. MITRE Corp.*, 2023 WL 2383772, at *5 (D. Mass. Mar. 6, 2023) ("Plaintiffs have plausibly alleged that there are two types of recordkeeping services provided by all national recordkeepers for large plans and that the Committee failed to use its substantial bargaining power to obtain these same services at a lower cost.").[11]

Accordingly, Plaintiffs' proposed, robust excessive recordkeeping allegations should be permitted to proceed as they meet the Supreme Court's standard set forth in *Hughes I and Tibble* and followed by courts across the country.

---

[11] *See also Coyer v. Univar Sols. USA Inc.*, 2022 WL 4534791, at *5 (N.D. Ill. Sept. 28, 2022) (held plaintiffs' pleadings do not need to present comparisons to "plans receiving the same services in the same year where, according to plaintiffs, the primary drivers of price in large plans are the number of accounts and whether the plan's fiduciaries solicited competitive bids, rather than the marginal cost of recordkeeping for each participant") (emphasis in original); *Lucero v. Credit Union Ret. Plan Ass'n*, 2023 WL 2424787, at *3 (W.D. Wis. Mar. 9, 2023) (upholding recordkeeping claims because "plaintiffs allege in their complaint that there isn't a meaningful difference in the recordkeeping services offered by large plans and that whatever differences there are 'do not affect the amount charged by recordkeepers … those allegations were missing in *Albert* …").

## 2.     The Proposed FAC's Allegations About Asset-Based Fees Bolster Plaintiffs' Claims

The district court's ruling that Plaintiffs' amended asset-based fees allegations were futile because they did not differ significantly from the original complaint is also incorrect under *Hughes I* and ignores that the FAC's additional significant allegations that Defendants' approval of asset-based fees resulted in unreasonable per participant recordkeeping and administrative expenses. *See* FAC ¶¶ 13-15, 66-69.

The FAC alleges specifically that in 2014, TIAA received at least $2.1 million for recordkeeping ($196 per participant), when the median per participant fee for comparable plans was $70. FAC ¶¶ 13; 71. This calculation is based on 15 bps paid on the Traditional Annuity (FAC ¶ 13 n. 7) but does not include amounts TIAA earned on the investment return of its general account, which Plaintiffs estimate to be a minimum of 1.5% of the total invested in the Traditional Annuity. FAC ¶ 16.

The FAC further alleges that the Plans paid additional asset-based recordkeeping fees to Vanguard and Fidelity that amounted to $113 per participant in 2015. FAC ¶ 17. Defendants caused DC Plan participants to pay excessive recordkeeping fees in some years in the range of $280 per participant, and participants in the Voluntary Plan to pay roughly

34

$175 per participant. FAC ¶ 20. The district court's consideration of these new allegations was superficial and failed to consider that at this stage and the motion to dismiss stage, the court must consider all reasonable inferences in the Plaintiffs' favor.  As such, the district court's holding should be reversed.

### 3.    The District Court Erred in Ruling that Plaintiffs Provided No Factual Support for a Flat $35 Per Participant Recordkeeping Fee

In *Hughes II*, the Seventh Circuit addressed the pleading burden for claims asserting unreasonable recordkeeping fees holding that plaintiffs had met the applicable pleading standard by alleging that: (1) the plans at issue paid between four to five million a dollars a year in fees; (2) a more reasonable fee would have been one million based on a $35 flat fee per participant based on features of the plans, nature of the services provided by the recordkeepers, the number of participants, and the recordkeeping market; (3) there were "numerous recordkeepers in the marketplace who are equally capable of providing a high level of service;" and (4) recordkeeping services are "commoditized" where recordkeepers primarily differentiate based on price (or in the words of the court, itself, recordkeeping services are "fungible and the market for them is highly

35

competitive"). *Id*. at *11 (differentiating the more specific factual allegations in *Hughes II* from the less robust factual allegations in *Albert*, 47 F.4th 570. *Id*. *11-*12).

Plaintiffs claim that Georgetown allowed participants to be charged excessive recordkeeping and administrative fees. *See* FAC ¶¶ 10–21, 24–28, 30–32, 62–72. Plaintiffs further allege that Georgetown failed to consolidate recordkeeping with a single provider unlike other university retirement plans. FAC ¶¶ 85–101 (identifying five universities that consolidated recordkeeping) and that a single recordkeeper could have provided the same service across the three platforms for a fixed fee in the range of $35 per year for each participant. FAC ¶ 67.

Numerous courts have upheld claims against fiduciaries of similar university 403(b) plans based on allegations that a per-participant recordkeeping fee should be no more than $35 annually, including the following:

- Denying NYU's motion to dismiss claim for excessive recordkeeping fees where plaintiffs alleged that "the market rate for administrative fees for plans like those at issue in this case was $35 per participant." *Sacerdote v. New York Univ.*, No. 16-

CV-6284 (KBF), 2017 WL 3701482, at *9 (S.D.N.Y. Aug. 25, 2017);

- Denying Brown University's motion to dismiss claim for excessive recordkeeping fees where plaintiffs alleged that the 403(b) "Plans paid significantly too much for recordkeeping compared to market rates, suggesting that $35-$45 annually per participant would be reasonable...." *See Short v. Brown Univ.*, 320 F. Supp. 3d 363, 371 (D.R.I. 2018);

- Denying Vanderbilt University's motion to dismiss excessive recordkeeping fee claim where plaintiffs alleged that "a reasonable record-keeping fee for the [403(b)] Plan would be a fixed ... $30 per participant." *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1064 (M.D. Tenn. 2018);

- Denying the University of Miami's motion to dismiss excessive recordkeeping fees where plaintiffs alleged "the market rate for such fees are $35 per participant, and here, participants had paid an excess of $100 in fees." *Santiago v. Univ. of Miami*, No. 1:20-CV-21784, 2021 WL 1173164, at *5 (S.D. Fla. Mar. 1, 2021),

37

*report and recommendation adopted,* No. 1:20-CV-21784, 2021 WL 1165441 (S.D. Fla. Mar. 26, 2021);

- Denying Yale University's motion for summary judgment where plaintiffs' evidence showed that "TIAA offered to recordkeep the [403(b)] Plans' fees for $34 per participant." *Vellali v. Yale Univ.*, No. 3:16-CV-1345(AWT), 2022 WL 13684612, at *14 (D. Conn. Oct. 21, 2022);

- Denying USC's motion to strike plaintiffs' expert testimony that "$30 represents a reasonable per-participant recordkeeping fee after identifying several 401(k) plans with per-participant recordkeeping fees below $30, 403(b) plans with recordkeeping fees as low as $33, and recordkeeping bids for Defendants' Plans as low as $21." *Munro v. Univ. of S. California*, No. 2:16-CV-06191-VAP-EX, 2022 WL 16955481, at *8 (C.D. Cal. Nov. 1, 2022);

- Denying 403(b) plan fiduciaries' motion to dismiss excessive recordkeeping fee claims where plaintiffs alleged that plans "with similar participant numbers all paid less than $35 per participant in RK & A fees." *Ruilova v. Yale-New Haven Hosp.,*

*Inc.*, No. 3:22-CV-00111-MPS, 2023 WL 2301962, at *4 (D. Conn. Mar. 1, 2023); and

- Denying 403(b) plan fiduciaries' motion to dismiss excessive recordkeeping fee claims where plaintiffs alleged "plans much smaller than the Plan—of only 100 participants and $5 million in assets—were paying an average of $35 per participant for "recordkeeping and administration costs in 2017." *In re Sutter Health ERISA Litig.*, No. 1:20-CV-01007-JLT, 2023 WL 1868865, at *10 (E.D. Cal. Feb. 9, 2023) (internal quotes omitted).

Thus, the district court erred in denying Plaintiffs leave to amend their excessive recordkeeping fee claims.

### 4. The FAC's Allegations about Investment Options Menus States a Claim for Imprudence

The district court found, without any analysis, that Plaintiffs' proposed allegations regarding the voluminous menu of investment options available to the Plans' participants were "futile.". But the Supreme Court upheld similar allegations in *Hughes I* about an excess of investment options when it reversing the Seventh Circuit's dismissal of similar claims. *Hughes I,* at 741.

39

Here, the district court failed to review Plaintiffs' claims regarding the number of investment options in the context of the other allegations in the FAC. Instead, the district court engaged in a "slice-and-dice" approach, which the Supreme Court rejected as inconsistent with ERISA's pleading standard. *Hughes I*, at 742 (instructing Seventh Circuit to "reevaluate the allegations as a whole" using a "context specific" enquiry); *see also Braden*, 588 F.3d at 594 (ERISA "complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible.").

When the new allegations in the FAC,—about the Benefits Advisory Committees' acknowledgment that the number of investment choices was excessive and that it was unlikely that the individuals performing Georgetown's fiduciary responsibilities reviewed prospectuses for the four hundred funds selected, let alone the competing funds, *see* FAC ¶¶ 76, 77—are considered alongside the original allegations, including that plans with hundreds of choices of funds are imprudent because the choices are overwhelming (FAC ¶ 73), it is plausible to find Defendants breached their fiduciary duty.

40

### 5. Plaintiffs Adequately Allege that Defendants Breached their Duties by Failing to Obtain Sufficient 408b-2 Disclosures

The proposed FAC alleges that Defendants violated ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) by failing to obtain adequate Rule 408b-2 disclosures. FAC ¶ 14. ERISA § 408(b)(2) requires fiduciaries to show that "no more than reasonable compensation is paid" to a party-in-interest for a particular service or transaction, or it will be deemed a transaction prohibited by ERISA. Further, the regulations implementing 408(b)(2) – 29 C.F.R. § 2550.408b-2 – create disclosure requirements that ensure that fiduciaries understand what compensation is being paid to their plans' service providers. *See Bugielski v. AT&T Servs.*, No. 21-56196, --- F.4th ---, 2023 U.S. App. LEXIS 20113, at *12-18 (9th Cir. Aug. 4, 2023).

The proposed FAC alleges that the disclosures and information that Defendants received from TIAA concerning, in particular, the total indirect and direct compensation that TIAA received from Georgetown, which is the critical information needed under the 408b-2 regulations, were deficient. Any issues raising whether the disclosures caused harm or whether or not the disclosures were complete and accurate are factual

41

issues not properly considered on a motion for leave to amend or a motion to dismiss, .

The district court's finding that these allegations were futile because they were not connected to any counts in the FAC, is again based on an improper "slice-and-dice" view of the allegations in isolation rather than the complaint as a whole. The improper disclosure allegations support the underlying theory that Defendants breached their fiduciary duty by engaging in an imprudent process. *See Silva v. Evonik Corp.*, 2020 WL 12574912 at *5 (D.N.J. Dec 30, 2022) ("The Court must ultimately assess whether the Investment Committee breached its duty of prudence by looking to its 'process rather than results' and inquiring whether it 'employed the appropriate methods to investigate and determine the merits of a particular investment.'") (citations omitted). The disclosures are one part of that process.

Plaintiffs claim that the failure to obtain the necessary disclosures is itself a fiduciary breach, in violation of the explicit duty of § 408(b)(2) to obtain such disclosures. The district court misinterpreted the statement in 29 C.F.R. § 2550.408b-2(c)(1)(i) that "[t]he requirements of this paragraph (c)(1) are independent of fiduciary obligations under

42

section 404 of the Act." The district court incorrectly stated that "**contractual arrangements between a covered plan and a covered service provider**" are "independent of fiduciary obligations under section 404 of the Act." Opinion Denying Leave to Amend at 37 (emphasis added). As *Hughes I* and *Tibble* make clear, plan fiduciaries have an ongoing fiduciary obligation to monitor and control costs arising from contractual arrangements between the plan and service providers. What the regulation actually means is that the obligations of ERISA § 408(b)(2) to obtain disclosures are independent of and *in addition to* the fiduciary obligations of ERISA § 404, The district court turned that language on its head, thereby protecting plan fiduciary Defendants who had clearly failed their obligations to obtain the necessary information, contributing to the astronomical fees participants paid in this case.

> ### 6. Plaintiffs Adequately Allege Defendants Breached their Duties by Misrepresenting the Variable Annuities

The FAC asserts that Defendants further breached their duty of prudence by failing to exercise sufficient diligence to understand the investment options they were offering in the Plans, and, as a result, misrepresented the nature of those offerings to the Plans' participants.

43

*See, e.g.,* FAC ¶¶ 15, 19. While the Plans purport to offer eight so-called variable annuities issued by TIAA, these investment options are not true annuities.[12] *Id.* ¶ 15. Rather, the prospectus for the variable annuities makes it clear that annuity payments are not made from the variable annuities. Instead, participants must use the value of their account invested in the variable annuities to purchase a separate annuity from TIAA: "CREF also deducts a mortality and expense risk charge that is paid to TIAA to guarantee that CREF participants transferring funds to TIAA for the immediate purchase of lifetime payout annuities will not be charged more than the rate stipulated in the CREF contract." *Id.* Moreover, the TIAA variable annuities are no more difficult or more complicated to administer than collective investment trusts or other insurance company separate accounts that are routinely offered in 401(k) and 403(b) plans. ¶ 43. They are merely pools of equity and fixed-income securities or cash equivalents that offer participants a vehicle for collective investment. *Id.* And, a participant can move all or a portion of

---

[12] The Plan's eight variable annuity investment options offered by TIAA-CREF are the CREF Stock Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, CREF Social Choice Account, CREF Global Equities Account, CREF Growth Account, CREF Equity Account and CREF Bond Market Account. ¶ 41.

her account balance into and out of these variable annuities on a daily basis just like she could in the available TIAA mutual funds. *Id*.

The prospectus for these purported variable annuities further reveals that upon a participant's sale of her interest in the variable annuity, or on her death, she or her estate receives nothing except the balance in the account. ¶ 44. To be sure, a participant who invests in these so-called variable annuities could arrange for a payout of her account balance over time by transferring the current account balance into a transfer payout annuity, however the aggregate payments from such "annuities" will never exceed the account balance as of the date lifetime payout is elected plus investment earnings, and it may be less. *Id*. Thus, the FAC's alleges a flawed fiduciary process and a breach of Defendants' duties of prudence and diligence, which has caused Plaintiffs and the other of the Plans' participants to pay unreasonable investment fees. *See Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016); *Tussey*, 746 F.3d at 336.

### 7. Plaintiffs Adequately Alleged that Defendants Violated Their Fiduciary Duty of Candor

The FAC alleges that Defendants breached their "duty of candor" by failing to report on the Plans' required Form 5500 "all direct and

45

indirect compensation received by the Plans' recordkeepers in connection with the provision of recordkeeping and administrative services." FAC ¶ 151. Defendants' failure to make required disclosures is a statutory violation. The Preamble to the regulations requiring 5500 disclosures make that clear:

> The Form 5500 Annual Return/Report is the primary source of information concerning the operation, funding, assets, and investments of pension and other employee benefit plans…for plan participants and beneficiaries…" Annual Reporting and Disclosure, 72 FR 64710-01.
>
> ------------------------------------------------------------------
>
> With respect to service providers…who received…other indirect compensation, the Schedule C requires more detailed information on the indirect compensation, including, in the case of certain key service providers, information regarding the payor if the service provider received during the plan year indirect compensation from a single source of $1,000 or more.

Annual Reporting and Disclosure, 72 FR 64710, 64712, 72 FR 64710-01, 64712.

Persistently filing inaccurate Annual Reports violates a Plan Administrator's duty of candor and could subject the Plan Administrator to the criminal penalties of perjury. ERISA § 502(a)(3) expressly allows a plan participant to bring an action to "enjoin any act or practice which violates any provision of this subchapter…." Deliberately filing false Annual Reports stating that Fidelity received $0 in indirect

compensation is clearly an exercise of discretion by a plan fiduciary. "ERISA explicitly authorizes suits against fiduciaries and plan administrators to remedy statutory violations…." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989).

Courts have long recognized that ERISA fiduciaries owe a duty of candor to plan participants and beneficiaries. *See, e.g., Varity Corp. v. Howe,* 516 U.S. 489, 506 (1996) ("As other courts have held, '[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries and cofidied in section 404(a)(1) of ERISA…'") (quoting *Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir. 1983); *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 98 (3d Cir. 2012) (stating, "A fiduciary's duties of loyalty and prudence under ERISA § 404 encompass a duty to communicate candidly….").[13] Monitoring and controlling

---

[13] *See also Chero-Key Piping Co. v. Great-West Life & Annuity Ins. Co.,* 2010 WL 1169957, n.14 (S.D. Tex. Mar. 23, 2010) ("The general duties that fiduciaries owe include a duty of loyalty and utmost good faith, a duty of candor, a duty to refrain from self-dealing…"); *Black's Law* Dictionary 625 (6th ed. 1990) (defining fiduciary as "a person having duties involving good faith, trust, special confidence and candor," "created by his undertaking to act primarily for another's benefit."). Defendants cite *Ackerman v. Waranco, Inc.* 55 F.3d 117, 124 (3d Cir. 1995) which was decided years before ERISA's current statutory disclosure framework was enacted and it involved a welfare benefits plan, not a defined contribution retirement plan, as here.

compensation paid to 401(k) plan service providers, and then making statutorily-mandated disclosures concerning such compensation, is also a fiduciary function. *See Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 328 (3d Cir. 2019) ("Fiduciaries must also understand and monitor plan expenses."). Despite owing the duty of candor to the Plans and their participants, Defendants failed to take the necessary steps to ensure that material information concerning indirect compensation was reported on the Form 5500 and was available to the Plans' participants. FAC ¶ 151-153.

## B. Plaintiffs Have Standing to Assert All the Claims in the FAC

### 1. Plaintiffs Have Constitutional Standing to Challenge Defendants' Fiduciary Decisionmaking Process Concerning All Plans' Funds and Fees

Fiduciary breach claims such as those at issue in this case are asserted "on behalf of the plan" under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). Once a plaintiff has established an Article III injury arising from alleged mismanagement of an ERISA plan, he or she may "seek relief under [ERISA] that sweeps beyond his own injury" because such claims are "brought in a representative capacity on behalf of the plan as a whole and … remedies … protect the entire plan." *Braden*, 588 F.3d at 593 (internal quotations omitted). Here, Plaintiffs' claims challenge

48

Defendants' general practice of fund selection and monitoring the fees *for the Plans in their entirety*, not for any one particular fund. One important question in this case, and the numerous cases like it, is whether the fees the participants paid were reasonable in light of the aggregate total paid from all the sources in the Plans and the services provided in return, an enquiry which as a matter of common sense sweeps beyond the funds the Plaintiffs themselves selected.

The Court of Appeals for the Third Circuit has ruled that ERISA defined contribution plan participants have constitutional standing to challenge the fees associated with all of the investment options in a plan once a plan participant is able to show that he or she invested in one of the challenged funds. *Boley v. Universal Health Servs.*, 36 F.4th 124, 132-33 (3d Cir. 2022) (citing *Sweda v. Univ. of Pa.*, 923 F.3d 320 (3d Cir. 2019)). The Third Circuit explained that:

> Since the Named Plaintiffs allege concrete injuries traceable to the challenged decisions and courses of conduct of the defendants, they have met the requirements for standing. Article III does not prevent the Named Plaintiffs from representing parties who invested in funds that were allegedly imprudent due to the same decisions or courses of conduct.

36 F.4th at 132. The Third Circuit's rational applies here with equal force. Numerous other courts around the country have reached the same conclusion.[14] No appellate court has ruled otherwise.

Defendants, in opposing Plaintiffs' motion for leave to amend, did not cite a single case supporting their position that Plaintiffs lacked constitutional standing. The district court also failed to cite any authority supporting its holding that Plaintiffs lack standing to pursue what the district court called the "Vanguard Claims" in its Opinion Denying Leave to Amend. Opinion Denying Leave to Amend, at 18-20.

---

[14] *Iannone v. Autozone, Inc.*, No. 19-cv-2779-MSN-tmp, 2022 U.S. Dist. LEXIS 185251, at *23-24 (W.D. Tenn. Aug. 12, 2022) (plaintiffs who assert plan-wide misconduct have constitutional standing to challenge funds in which they were not personally invested) (collecting cases). *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2016 WL 4507117, at *4 (C.D. Cal. Aug. 5, 2016) ("courts look to the nature of the claims and allegations to determine whether the pleaded injury relates to the defendants' management of the Plan *as a whole*."); *Taylor v. United Techs. Corp.*, 2008 WL 2333120, at *2-3 (D. Conn. June 3, 2008) (holding plaintiffs had standing to pursue ERISA representational claims related to funds and revenue sharing even though none of the plaintiffs had invested in the fund in question and none "were adversely affected by revenue sharing."); *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 155-56 (S.D.N.Y. 2017) ("[P]laintiffs do not need to point to individualized injuries with respect to each Plan investment in order to establish constitutional standing in a derivative suit brought pursuant to [502](a)(2).").

In addition to creating a departure from the Third Circuit and other courts, the district court's ruling ignores the practical reality. Adopting the district court's ruling would arbitrarily preclude review of potentially improper investment options simply because the individual participants who stood up for the rights of a plan in court did not choose to invest their retirement savings in those particular options. The district court's approach elevates pointless abstract legal formalism over the substance of the issues for no other reason than to limit the ability of plan participant plaintiffs who have undisputedly been injured by the conduct at issue from protecting the rights of the plan, as Congress intended when it adopted § 1132(a)(2).

### 2. Plaintiff Wilcox Has Constitutional Standing to Challenge the Transfer Restrictions and Surrender Charge in the TIAA Traditional Annuity

The district court erred when it ruled Plaintiff Wilcox lacked standing to challenge the TIAA Traditional Annuity's 10-year lock-up and 2.5% surrender charge. There is no dispute that (i) Plaintiff Wilcox invested in the Traditional Annuity; (ii) the surrender charge was a provision of the Traditional Annuity; (iii) the 10-year lock-up was a provision of the Traditional Annuity, and (iv) Plaintiff Wilcox was subject

51

to the 2.5% surrender charge and 10-year lock-up provisions when he sought to withdraw his retirement savings from the Traditional Annuity.

The 10-year lock-up and 2.5% surrender charges at issue are abusive and illegal under ERISA. Transactions between ERISA plans (such as the Plans) and service providers (such as TIAA), called "parties in interest," ERISA § 3(14)(B), that involve plan assets are prohibited by ERISA § 406(a) unless exempt under ERISA § 408. Congress delegated authority to the Department of Labor (the "DOL") to adopt regulations construing ERISA § 408, and the DOL has adopted regulations specifying:

> No contract or arrangement is reasonable within the meaning of section 408(b)(2) of the Act and paragraph (a)(2) of this section if it does not permit termination by the plan without penalty to the plan on reasonably short notice under the circumstances to prevent the plan from becoming locked into an arrangement that has become disadvantageous.

29 C.F.R. § 2550.408b-2(c)(3); *Bugielski*, 2023 U.S. App. LEXIS 20113, at *12-18.

Here, there is no meaningful dispute that the 10-year lock-up and the 2.5% surrender charge violate the letter and spirit of 408b-2(c)(3). The clear intention of these restrictions is to prohibit participants from

withdrawing from the low-yielding fixed income fund in order to take advantage of higher yielding equity funds[15], and to make withdrawal from the TIAA Traditional Annuity at retirement so painful that none would ever do so, thereby allowing TIAA to invest that money from its general account and earn handsome profits on those funds.

Regardless of whether or not Plaintiff Wilcox suffered a financial injury from the lock-up and surrender charge provisions of the TIAA Traditional Annuity, Plaintiff Wilcox nevertheless still has standing to pursue his claims for injunctive and declaratory relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) to preclude imposition of the surrender charge and 10-year lock-up provisions in the future.

As the Sixth Circuit explained in considering a similar issue, an ERISA plaintiff "need not demonstrate individualized injury to proceed with their claims for injunctive relief under § 1132(a)(3); they may allege only violation of the fiduciary duty owed to them as a participant in and beneficiary of their respective ERISA plans." *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 610 (6th Cir. 2007). Decisions from other

---

[15] The disadvantage to participants could not have been more obvious than during the sustained growth in equity markets in the ten years since the financial crisis of 2009.

Circuits are in accord. *See Peters v. Aetna Inc.*, 2 F.4th 199, 219 (4th Cir. 2021) ("Even if [plan participant plaintiff] failed to demonstrate a financial injury for standing purposes as to the restitution claim, her allegations revolving around breach of fiduciary duty would separately provide her standing to pursue claims for surcharge, disgorgement, and declaratory and injunctive relief."); *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 102 (2d Cir. 2011) ("[A] plaintiff may have Article III standing to obtain injunctive relief related to ERISA's fiduciary duty requirements without a showing of individual harm….") (quotations and editing marks removed); *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 456 (3d Cir. 2003) ("the disclosure requirements and fiduciary duties contained in ERISA create in [the participant -plaintiff] certain rights, including the rights to receive particular information…. [plaintiff] need not demonstrate actual harm in order to have standing to seek injunctive relief requiring that [defendant] satisfy its statutorily-created disclosure or fiduciary responsibilities.").

In addition, in *Hughes I*, the Supreme Court held that imprudent decisions by ERISA plan fiduciaries are actionable regardless of "the participants' ultimate choice over their investments." 142 S. Ct. at 742.

Thus, *Hughes I* rejected the premise underlying the district court's decision that particular participant conduct is required or can preclude the participant from bringing suit to remedy an ERISA fiduciary's breach. The district court's rulings on standing should, accordingly, be reversed.

## VI.   CONCLUSION

For the foregoing reasons, the Court should (i) reverse the district court's decision to deny Plaintiffs' motion for leave to amend; and (ii) remand the case to the district court with instructions to grant Plaintiffs leave to file the proposed FAC.

Respectfully submitted,

Dated: August 14, 2023

By: */s/ James A. Bloom*
Todd M. Schneider
James A. Bloom
SCHNEIDER WALLACE
COTTRELL KONECKY LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
jbloom@schneiderwallace.com

ELLEN T. NOTEWARE
ABIGAIL J. GERTNER
NATALIE LESSER
BERGER MONTAGUE PC

55

1818 MARKET STREET, SUITE 3600
PHILADELPHIA, PA 19103
TELEPHONE: (215) 875-3000
FACSIMILE: (215) 875-4604
ENOTEWARE@BM.NET
AGERTNER@BM.NET
NLESSER@BM.NET

Eric Lechtzin
EDELSON LECHTZIN LLP
411 S. State Street, Suite N-300
Newton, PA 18940
Telephone: (215) 867-2399
elechtzin@edelson-law.com

*Attorneys for the Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, <u>TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS</u>

1.     Type-Volume

This document complies with the word limit-volume limitation of Fed. R. App. P. 27(d)(2)(A) and Fed. R. App. P. 32(g)(1) because it contains 11,380 excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2.     Typeface and Type-Style

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). because it was prepared in a proportionately spaced typeface using Microsoft Word, in Century Schoolbook 14-point type for text and footnotes.

Dated: August 14, 2023                By: */s/ James A. Bloom*
                                           James A. Bloom

                                           *Counsel for Plaintiffs-Appellants*

57

<u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on August 14, 2023, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

Dated: August 14, 2023        */s/ James A. Bloom*
                             James A. Bloom

                             *Counsel for Plaintiffs-Appellants*