ORAL ARGUMENT NOT YET SCHEDULED
**No. 23-7059**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

DARRELL WILCOX; MICHAEL MCGUIRE,
individually and as representatives of a class of participants and
beneficiaries in and on behalf of the Georgetown University Defined
Contribution Retirement Plan, the Georgetown University Voluntary
Contribution Retirement Plan,

*Plaintiffs-Appellants*,

v.

GEORGETOWN UNIVERSITY;
CHRISTOPHER AUGOSTINI; GEOFF CHATAS,

*Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Columbia, No. 18-cv-422 (Hon. Amy Berman Jackson)

**RESPONSE BRIEF FOR DEFENDANTS-APPELLEES**

Nancy G. Ross
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 701-8788

Nicole A. Saharsky
E. Brantley Webb
Minh Nguyen-Dang
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 362-3000
nsaharsky@mayerbrown.com

*Counsel for Defendants-Appellees Georgetown University,
Christopher Augostini, and Geoff Chatas*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

### A.    Parties And *Amici*

The parties in the district court were Plaintiffs Darrell Wilcox and Michael McGuire and Defendants Georgetown University, Christopher Augostini, and Geoff Chatas.  No *amici* appeared in the district court.

The parties in this Court are Appellants Darrell Wilcox and Michael McGuire and Appellees Georgetown University, Christopher Augostini, and Geoff Chatas.  No *amici* have yet appeared in this Court.

Pursuant to Circuit Rule 26.1, Georgetown University states that it has no parent company and that no publicly held company has a 10% or greater ownership interest in Georgetown University.

### B.    Rulings Under Review

The rulings under review in this appeal are the district court's January 8, 2019, Memorandum Opinion (Dkt.35) and Order (Dkt.36) granting Appellees' motion to dismiss; and the district court's May 29, 2019, Memorandum Opinion (Dkt.42) and Order (Dkt.43) and March 31, 2023, Memorandum Opinion (Dk.76) and Order (Dkt.75) denying Appellants' motion for leave to file an amended complaint.

i

## C.    Related Cases

This case previously was before this Court, as *Wilcox v. Georgetown University*, No. 19-7065.  Appellees are unaware of any other related cases pending in this Court or any other court.


       */s/ Nicole A. Saharsky*
Nicole A. Saharsky

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

STATEMENT OF ISSUES ................................................................3

STATUTES AND REGULATIONS ..................................................3

STATEMENT OF THE CASE ...........................................................3

    A.   Statutory Background ..............................................................3

    B.   Factual Background ................................................................7

    C.   Procedural History ...............................................................10

        1.   Plaintiffs' Complaint ...................................................10

        2.   The District Court's First Decision ............................11

        3.   Plaintiffs' Proposed Amended Complaint ...................14

        4.   The District Court's Second Decision .........................16

SUMMARY OF ARGUMENT ..........................................................19

ARGUMENT ....................................................................................23

Standard Of Review ........................................................................23

I.   PLAINTIFFS LACK ARTICLE III STANDING ....................23

    A.   Plaintiffs Lack Standing To Challenge The Vanguard Share Classes ...............................................................................24

    B.   Plaintiffs Lack Standing To Challenge The Withdrawal Restrictions On The TIAA Traditional Annuity .........................28

II.  THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' CLAIMS AND DETERMINED THAT AMENDMENT WOULD BE FUTILE ..................................31

    A.   Plaintiffs Fail To State A Claim Based On Recordkeeping Fees ...................................................................................32

        1.   Plaintiffs Fail To Plead Facts Showing That Comparable Plans Paid Lower Fees For Comparable Services ....................................................33

        2.   The New Allegations Do Not Plausibly Plead Imprudence ..................................................................37

## TABLE OF CONTENTS
### (continued)

**Page**

      a.   Plaintiffs' allegations about other universities' plans do not permit a meaningful comparison to the Plans................................................................37

      b.   Plaintiffs' allegations about unspecified other defined-contribution plans do not permit a meaningful comparison to the Plans..............................41

    3.   Plaintiffs' Arguments Lack Merit...........................................43

      a.   Decisions in other cases do not make Plaintiffs' allegations plausible.........................................................43

      b.   Plaintiffs must provide a meaningful benchmark to show imprudence...............................................................48

      c.   Plaintiffs' remaining allegations do not plausibly state a claim.........................................................................49

B.   Plaintiffs Fail To State A Claim Based On Imprudent Management...............................................................................51

    1.   Georgetown Did Not Act Imprudently By Offering Too Many Investment Options ...........................................52

    2.   Georgetown Did Not Act Imprudently By Failing To Audit Disclosures.....................................................53

    3.   Georgetown Did Not Act Imprudently By Misunderstanding TIAA's Variable Annuities.......................57

C.   Plaintiffs Fail To State A Claim Based On Reporting Obligations ..............................................................................59

CONCLUSION ...................................................................................62

ADDENDUM

APPLICABLE STATUTES AND REGULATIONS ....................................1a

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Abbas v. Foreign Pol'y Grp., LLC,*
    783 F.3d 1328 (D.C. Cir. 2015) ...............................................................27

*Aguiar v. DEA,*
    992 F.3d 1108 (D.C. Cir. 2021) ...............................................................32

*Air Excursions LLC v. Yellen,*
    66 F.4th 272 (D.C. Cir. 2023) .................................................................46

*Albert v. Oshkosh Corp.,*
    47 F.4th 570 (7th Cir. 2022).............................................................36, 45

\* *Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .........................................................................32, 56

\* *Attias v. Carefirst, Inc.,*
    865 F.3d 620 (D.C. Cir. 2017) ...............................................................29

*Banneker Ventures LLC v. Graham,*
    798 F.3d 1119 (D.C. Cir. 2015) .................................................................7

*Barrett v. Pioneer Nat. Res. USA, Inc.,*
    No. 17-cv-1579, 2018 WL 3209108 (D. Colo. June 29, 2018) ..................26

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...............................................................................27

*Boley v. Univ. Health Servs., Inc.,*
    36 F.4th 124 (3d Cir. 2022) ..............................................................25, 26

*Braden v. Wal-Mart Stores, Inc.,*
    588 F.3d 585 (8th Cir. 2009) ............................................................25, 26

*Brosted v. Unum Life Ins. Co. of Am.,*
    421 F.3d 459 (7th Cir. 2005)..................................................................56

\* Authorities on which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)** **Page(s)**

*Brown v. MITRE Corp.*,
No. 22-cv-10976, 2023 WL 2383772 (D. Mass. Mar. 6, 2023) ...............49

*Bugielski v. AT&T Servs., Inc.*,
76 F.4th 894 (9th Cir. 2023) ...............................................................55, 60

*Cares Cmty. Health v. U.S. Dep't of Health & Hum. Servs.*,
944 F.3d 950 (D.C. Cir. 2019) ...............................................................23

*Chao v. Merino*,
452 F.3d 174 (2d Cir. 2006).....................................................................33

*Chero-Key Piping Co. v. Great-W. Life & Annuity Ins.*,
No. 08-cv-2696, 2010 WL 1169957 (S.D. Tex. Mar. 23, 2010) ...............60

*In re Citigroup ERISA Litig.*,
662 F.3d 128 (2d Cir. 2011).....................................................................60

*City of L.A. v. Lyons*,
461 U.S. 95 (1983) ...................................................................................26

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ...........................................................................27, 29

*Clark v. Feder Semo & Bard, P.C.*,
739 F.3d 28 (D.C. Cir. 2014) ...................................................................59

*Conkright v. Frommert*,
559 U.S. 506 (2010) ..................................................................................4

*Coppel v. SeaWorld Parks & Ent., Inc.*,
No. 21-cv-1430, 2023 WL 2942462 (S.D. Cal. Mar. 22, 2023)...............49

*Coyer v. Univar Sols. USA Inc.*,
No. 22-cv-362, 2022 WL 4534791 (N.D. Ill. Sept. 28, 2022)...................49

*Cunningham v. Cornell Univ.*,
No. 16-cv-6525, 2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) ...............48

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                    **Page(s)**

*Divane v. Nw. Univ.*,
  953 F.3d 980 (7th Cir. 2020) ....................................................44

*Faber v. Metro Life Ins.*,
  648 F.3d 98 (2d Cir. 2011)........................................................30

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014) ...........................................................4, 33

*Fink v. Nat'l Sav. & Tr. Co.*,
  772 F.2d 951 (D.C. Cir. 1985) ...............................................4, 5

*Finnbin, LLC v. CPSC*,
  45 F.4th 127 (D.C. Cir. 2022)...................................................30

*Fritton v. Taylor Corp.*,
  No. 22-cv-415, 2023 WL 5348834 (D. Minn. Aug. 21, 2023) ...................42

*Godfrey v. Greatbanc Tr. Co.*,
  No. 18-cv-7918, 2019 WL 4735422 (N.D. Ill. Sept. 26, 2019) ................61

*Gov't of Man. v. Bernhardt*,
  923 F.3d 173 (D.C. Cir. 2019) .................................................30

*Gudger v. Dist. of Columbia*,
  74 F. Supp. 3d 47 (D.D.C. 2014) ..............................................30

*Henderson v. Emory Univ.*,
  252 F. Supp. 3d 1344 (N.D. Ga. 2017).........................................52

*Horvath v. Keystone Health Plan E., Inc.*,
  333 F.3d 450 (3d Cir. 2003)....................................................30

*Hughes v. Nw. Univ.*,
  595 U.S. 170 (2022) ...................... 31, 33, 34, 43, 44, 47, 52, 53

*Hughes v. Nw. Univ.*,
  63 F.4th 615 (7th Cir. 2023)............................ 44, 45, 46, 51, 53

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                        **Page(s)**

*Kareem v. Haspel*,
    986 F.3d 859 (D.C. Cir. 2021) ................................................................. 46

*Krutchen v. Ricoh USA, Inc.*,
    No. 22-cv-678, 2023 WL 3026705 (E.D. Pa. Apr. 20, 2023) ................... 50

*LaRue v. DeWolff, Boberg & Assoc., Inc.*,
    552 U.S. 248 (2008) .................................................................................. 8

*Lincoln Nat'l Life Ins. v. Transamerica Fin. Life Ins.*,
    No. 04-cv-396, 2007 WL 710119 (N.D. Ind. Mar. 6, 2007) ..................... 57

*Lockheed Corp. v. Spink*,
    517 U.S. 882 (1996) .................................................................................. 3

*Loomis v. Exelon Corp.*,
    658 F.3d 667 (7th Cir. 2011) .................................................................... 51

*Loren v. Blue Cross & Blue Shield of Mich.*,
    505 F.3d 598 (6th Cir. 2007) .................................................................... 30

*Lucero v. Credit Union Ret. Plan Ass'n*,
    No. 22-cv-208, 2023 WL 2424787 (W.D. Wis. Mar. 9, 2023) .................. 49

\* *Matney v. Barrick Gold of N. Am.*,
    80 F.4th 1136 (10th Cir. 2023) ........................................... 33, 34, 49, 51

\* *Matousek v. MidAmerican Energy Co.*,
    51 F.4th 274 (8th Cir. 2022) .......................................................34, 42, 49

*Nat'l Sec. Sys., Inc. v. Iola*,
    700 F.3d 65 (3d Cir. 2012) ...................................................................... 60

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins.*,
    513 U.S. 251 (1995) ..................................................................5, 9, 29, 58

*Osborn v. Visa Inc.*,
    797 F.3d 1057 (D.C. Cir. 2015) ............................................................... 23

## TABLE OF AUTHORITIES
### (continued)

**Cases (continued)**                                                **Page(s)**

*Pegram v. Herdrich*,
   530 U.S. 211 (2000) ...................................................................60

*Peters v. Aetna, Inc.*,
   2 F.4th 199 (4th Cir. 2021)......................................................30

*Raines v. Byrd*,
   521 U.S. 811 (1997) ................................................................27

*Reed v. Queens Vill. Comm. for Mental Health for J-CAP, Inc.*,
   No. 18-cv-3114, 2019 WL 4452386 (E.D.N.Y. Sept. 17, 2019) ...............61

*Renfro v. Unisys Corp.*,
   671 F.3d 314 (3d Cir. 2011)................................................5, 52

*Riley v. Olin Corp.*,
   No. 21-cv-1328, 2022 WL 2208953 (E.D. Mo. June 21, 2022)................42

*Sacerdote v. N.Y. Univ.*,
   328 F. Supp. 3d 273 (S.D.N.Y. 2018)............................................13, 48, 50

*Sacerdote v. N.Y. Univ.*,
   No. 16-cv-6284, 2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017) ...........52, 53

*Smith v. CommonSpirit Health*,
   37 F.4th 1160 (6th Cir. 2022)......................................................34, 42, 49

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ................................................................23

*PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan
   Stanley Inv. Mgmt. Inc.*,
   712 F.3d 705 (2d Cir. 2013)................................................5, 33

*Sweda v. Univ. of Penn.*,
   923 F.3d 320 (3d Cir. 2018)................................................46, 47

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                                 **Page(s)**

*Taveras v. UBS AG,*
   513 F. App'x 19 (2d Cir. 2013) ...................................................................60

\* *Thole v. U.S. Bank N.A.,*
   140 S. Ct. 1615 (2020) ........................................................................24, 27

*Tibble v. Edison Int'l,*
   575 U.S. 523 (2015) .................................................................................33

\* *TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021) ..................................................................24, 30, 31

*Tussey v. ABB, Inc.,*
   746 F.3d 327 (8th Cir. 2014) ....................................................................51

*Varity Corp. v. Howe,*
   516 U.S. 489 (1996) .................................................................................60

*Vellali v. Yale Univ.,*
   308 F. Supp. 3d 673 (D. Conn. 2018).......................................................52

*Wilcox v. Georgetown Univ.,*
   987 F.3d 143 (D.C. Cir. 2021) .................................................................14

**Constitution, Statutes, Regulations, and Rules**

U.S. Const. art. III................................................. 3, 12, 16, 19, 23, 24, 27, 29

26 U.S.C. § 401(k)..............................................................................6, 42

26 U.S.C. § 403(b) .................................................................. 3, 5, 6, 38, 42

26 U.S.C. § 403(b)(7) .................................................................................6

Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*...........1

   29 U.S.C. § 1001(b) ................................................................................4

   29 U.S.C. § 1002(21)(A) ........................................................................60

## TABLE OF AUTHORITIES
### (continued)

| Statutes, Regulations, and Rules (continued) | Page(s) |
|---|---|

29 U.S.C. § 1104(a) ........................................................................59

29 U.S.C. § 1104(a)(1).................................................................4, 59

29 U.S.C. § 1104(a)(1)(B)............................................................4, 33

29 U.S.C. § 1106(a) ....................................................................53, 56

29 U.S.C. § 1108(b)(2) ......................................................................56

29 U.S.C. § 1109(a) ....................................................................26, 56

29 U.S.C. § 1132(a)(2) ......................................................................56

29 U.S.C. § 1132(a)(3) ................................................................30, 56

Technical Amendments Act of 1958, Pub. L. No. 85-866, § 23,
72 Stat. 1606, 1620-21 .......................................................................6

29 C.F.R. § 2509.75-8 .......................................................................61

29 C.F.R. § 2520.103-1(b)(1) ...........................................................59

29 C.F.R. § 2550.404a-1 ...................................................................55

29 C.F.R. § 2550.404a-1(b)(1)(i) ........................................................5

29 C.F.R. § 2550.408b-2 ............................................... 53, 54, 55, 56

29 C.F.R. § 2550.408b-2(a)...............................................................31

29 C.F.R. § 2550.408b-2(c)(1)..........................................................54

29 C.F.R. § 2550.408b-2(c)(1)(iv) ...............................................53, 54

29 C.F.R. § 2550.408b-2(c)(1)(ix) ....................................................54

29 C.F.R. § 2550.408b-2(c)(3)..........................................................31

Fed. R. Civ. P. 15(a)(2) ....................................................................32

## TABLE OF AUTHORITIES
### (continued)

**Rules (continued)**                                                      **Page(s)**

Fed. R. Civ. P. 59(e)..........................................................................14

Fed. R. Civ. P. 60(b).........................................................................14

**Other Authorities**

*Black's Law Dictionary* (10th ed. 2014) ...........................................57

Deloitte, *Defined Contribution Benchmarking Survey* (2017)......................6

H.R. Rep. No. 93-533 (1973) ............................................................4

Plan Sponsor Council of Am., *2017 403(b) Plan Survey* (2017)....................6

Restatement (Third) of Trusts (2007) ......................................18, 59

# GLOSSARY

| | |
|---|---|
| Compl. | Original Complaint, Dkt.1 |
| Defined Contribution Plan | The Georgetown University Defined Contribution Retirement Plan |
| ERISA | Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq*. |
| Georgetown | Defendants Georgetown University, Christopher Augostini, and Geoff Chatas |
| Plans | The Georgetown University Defined Contribution Retirement Plan and the Georgetown University Voluntary Contribution Retirement Plan |
| Proposed Compl. | Proposed First Amended Complaint, Dkt.58-2 |
| TIAA | The Teachers Insurance Annuity Association |
| University | Defendant Georgetown University |
| Voluntary Plan | The Georgetown University Voluntary Contribution Retirement Plan |

## INTRODUCTION

Plaintiffs challenge various aspects of Georgetown University's retirement plans under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* Two different district courts rejected Plaintiffs' claims, holding that Plaintiffs lack standing with respect to some claims and fail to state a claim with respect to others. This Court should affirm.

Georgetown University provides its employees with comprehensive benefits, including the two retirement plans at issue (the Plans). Plaintiffs, two Georgetown University employees and plan participants, challenge Georgetown's administration of the Plans. They allege that Georgetown violated ERISA's duty of prudence because the Plans charge excessive fees, include too many investment options, and offer options that Plaintiffs think are too costly. They also challenge the Plans' most popular investment option – an annuity product that is a staple of university retirement plans – because it includes withdrawal restrictions.

Two district courts carefully reviewed Plaintiffs' allegations and correctly concluded that none states a claim. Even though the first court pointed out the deficiencies in Plaintiffs' original complaint, Plaintiffs did not fix them the second time around. After two bites at the apple, this case remains a "lawsuit in search of a theory." Dkt.76 at 2.

1

ERISA gives plan fiduciaries flexibility to design and administer their plans, so long as the process they use is reasonable under the circumstances. Although Plaintiffs may disagree with how Georgetown manages the Plans, they do not allege facts to infer that its process was unreasonable. They do not allege that any plan offered the same investment options and level of services as the Plans but paid less in fees. They also do not allege that they were confused or overwhelmed by the investment options offered in the Plans. And they do not allege that they invested in any of the supposedly costly investment options or sought to withdraw funds from the annuity product.

On appeal, Plaintiffs barely discuss their allegations, and they do not respond to many of the district courts' reasons for rejecting their claims. Instead, they principally argue that other courts in other circuits have allowed claims against other universities to proceed to discovery. But ERISA's duty of prudence is context specific, and this appeal is about the allegations in this case. Here, the most the allegations suggest is that Georgetown could have structured and administered its plans differently, not that it acted unreasonably in making the choices it did.

This Court should affirm.

## STATEMENT OF ISSUES

1.    Whether Plaintiffs lack Article III standing to challenge the inclusion of certain share classes of Vanguard mutual funds in Georgetown University's two retirement plans and the withdrawal restrictions on the TIAA Traditional Annuity in one of the plans.

2.    Whether the district court correctly dismissed the complaint for failure to state a claim and denied leave to amend the complaint because amendment would be futile.

## STATUTES AND REGULATIONS

All applicable statutes and regulations are reproduced in the addendum.  *See* Add., *infra*, 1a-13a.

## STATEMENT OF THE CASE

Plaintiffs Darrell Wilcox and Michael McGuire are Georgetown University employees who challenge the administration of two retirement plans the University offers to its faculty and staff.  Both plans are governed by ERISA and are established under 26 U.S.C. § 403(b).

### A.    Statutory Background

1.    ERISA regulates certain employer-sponsored benefit plans.  It does not require employers to offer benefit plans or to provide any particular type of plan or level of benefit.  *Lockheed Corp. v. Spink*, 517 U.S. 882, 887

(1996).  Instead, it imposes duties on fiduciaries once an employer has decided to provide a benefit plan.  29 U.S.C. § 1001(b) (ERISA protects "the interests of participants in employee benefit plans and their beneficiaries" by "establishing standards of conduct, responsibility, and obligation for fiduciaries of [those] plans").  This statutory scheme "represents a careful balanc[e]" between protecting plan beneficiaries and imposing burdensome regulations that could discourage employers from offering retirement plans in the first place. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 424-25 (2014) (internal quotation marks omitted); *see Conkright v. Frommert*, 559 U.S. 506, 517 (2010); H.R. Rep. No. 93-533, at 218 (1973).

ERISA imposes a duty of prudence on plan fiduciaries.  29 U.S.C. § 1104(a)(1).  In particular, it requires a plan fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing" as a prudent person "acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B).  "Prudence under ERISA is measured according to the objective prudent person standard developed in the common law of trusts." *Fink v. Nat'l Sav. & Tr. Co.*, 772 F.2d 951, 955 (D.C. Cir. 1985).

4

The prudence standard "focuses on a fiduciary's conduct in arriving at an investment decision, not on its results." *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013); *see Renfro v. Unisys Corp.*, 671 F.3d 314, 322 (3d Cir. 2011).  A fiduciary satisfies the duty of prudence when he or she "[h]as given appropriate consideration to" the relevant "facts and circumstances," including the role of the investment in the plan's overall "investment portfolio."  29 C.F.R. § 2550.404a-1(b)(1)(i).  To state a claim for breach of the duty of prudence, a plaintiff must allege facts to show that the fiduciary failed to give appropriate consideration to the relevant factors – not just that the fiduciary reached a decision with which the plaintiff disagrees.  *See Fink*, 772 F.2d at 955.

2.    This case involves retirement plans established under 26 U.S.C. § 403(b).  Congress enacted Section 403(b) in 1958 to provide favorable tax treatment to retirement plans for universities and other nonprofit organizations.  Dkt.35 at 3.  Historically, universities provided annuities as their retirement benefits.  *Id.*  Annuities are long-term insurance contracts that, starting at retirement, guarantee regular payments for the lives of the beneficiaries.  *NationsBank of N.C., N.A. v. Variable Annuity Life Ins.*, 513 U.S. 251, 254, 262 (1995); *see* Dkt.35 at 3 n.2.

As originally enacted, Section 403(b) was limited to annuities. It allowed university retirement plans to purchase annuities for employees without immediate taxation to the employees. Technical Amendments Act of 1958, Pub. L. No. 85-866, § 23, 72 Stat. 1606, 1620-21. In 1974, Congress amended Section 403(b) to allow those plans to offer other investment options, such as mutual funds. Dkt.35 at 4 (citing 26 U.S.C. § 403(b)(7)). Nonetheless, annuities remain the cornerstone of university retirement plans. Over two-thirds of 403(b) plans offer annuities, compared to just 6% of corporate retirement plans established under 26 U.S.C. § 401(k). Plan Sponsor Council of Am., *2017 403(b) Plan Survey* tbl.58 (2017), *Sacerdote v. N.Y. Univ.*, No. 16-cv-6284 (S.D.N.Y. Jan. 10, 2018) (ECF No. 134-5); Deloitte, *Defined Contribution Benchmarking Survey* 20 (2017), bit.ly/ 3FcPj7g.

The principal provider of annuities to university retirement plans is the Teachers Insurance and Annuity Association (TIAA). Dkt.35 at 3. TIAA was founded in 1918 "with the purpose of investing in annuities to pay pensions to teachers for their lifetimes after retirement." *Id.* at 16. TIAA's annuities are "specially designed for college retirement plans." *Id.* at 3 (internal quotation marks omitted). Many plan participants choose annuities

because their guaranteed payments provide certainty in retirement.  *Id.* at 16-17.

### B.    Factual Background

The following facts are drawn from Plaintiffs' Complaint (Compl.), Dkt.1, and Proposed First Amended Complaint (Proposed Compl.), Dkt.58-2, which are taken as true at the motion-to-dismiss stage, *see Banneker Ventures LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

1.    Georgetown University provides its employees with many benefits, including two retirement plans:  the Georgetown University Defined Contribution Retirement Plan (the Defined Contribution Plan), and the Georgetown University Voluntary Contribution Retirement Plan (the Voluntary Plan).  Dkt.35 at 2.  The University is the Plans' administrator and a fiduciary.  *Id.*  It is responsible for managing the Plans, which includes selecting, monitoring, and removing investment options.  *Id.*

The Plans are different in terms of how they are funded.  For the Defined Contribution Plan, the University automatically contributes an amount equal to 5% of a participant's salary, and then the participant can choose to contribute up to an additional 3% of salary, which the University

matches at a rate of 1.67-to-1. Dkt.35 at 5. For the Voluntary Plan, a participant may (but is not required to) contribute additional amounts of salary. *Id.* at 2, 5.

Both the Defined Contribution Plan and the Voluntary Plan are defined-contribution (rather than defined-benefit) plans – meaning that the participant receives "the value of an individual account at retirement," as opposed to a set benefit amount. Dkt.35 at 2 (quoting *LaRue v. DeWolff, Boberg & Assoc., Inc.*, 552 U.S. 248, 250 n.1 (2008)). The value of the individual's account at retirement depends on the "amounts contributed to that account and the investment performance of those contributions." *Id.* (quoting *LaRue*, 552 U.S. at 250 n.1). Each participant decides how to invest the funds in his or her individual account. *Id.*

2.     Both Plans offer a wide variety of investment options, including TIAA fixed and variable annuities and mutual funds from TIAA, Vanguard, and Fidelity. Dkt.35 at 5-6. TIAA, Vanguard, and Fidelity each charge fees, calculated as a percentage of account values. *Id.* Those fees are fully disclosed in prospectuses and periodic statements. *Id.* Plaintiffs focus on two types of fees: investment-management and recordkeeping fees. Investment-management fees compensate a fund manager for overseeing the as-

8

sets. *Id.* at 22. Recordkeeping fees compensate a service provider for performing administrative tasks (such as tracking contributions and investment allocations and managing distributions) and, in some plans, for providing additional services to participants (such as one-on-one investment advice). *Id.* at 12 n.8, 24 (internal quotation marks omitted).

Plaintiffs' allegations focus on one investment option, the TIAA Traditional Annuity. The Traditional Annuity is a fixed annuity, meaning that starting at retirement, it provides regular payments for the rest of the beneficiary's life. Dkt.35 at 6 (citing *NationsBank*, 513 U.S. at 262). The Traditional Annuity is "by far the largest single investment fund" in the Plans. Proposed Compl. ¶ 20 n.8.

Both Plans offer the TIAA Traditional Annuity, although the terms differ. A participant who invests in the Traditional Annuity in the Voluntary Plan can withdraw the funds at any time without penalty. Dkt.35 at 7. A participant who invests in the Traditional Annuity in the Defined Contribution Plan earns a higher return (typically an additional 0.75% per year), but the funds are less accessible. *Id.* Specifically, the participant cannot withdraw the funds while employed at the University but can redirect the funds in ten annual installments. *Id.* Then, when leaving the University,

9

the participant either can withdraw the funds in a lump sum and pay a 2.5% fee or leave the funds in the plan. *Id.*; *see* Compl. ¶ 134.

### C.    Procedural History

#### 1.    Plaintiffs' Complaint

Plaintiffs are Georgetown University employees and participants in the Plans. Compl. ¶ 1. Plaintiff Wilcox alleged that he invested in the TIAA Traditional Annuity, one TIAA variable annuity, and several TIAA mutual funds through the plans. *Id.* ¶ 20. Plaintiff McGuire alleged that he invested in several TIAA variable annuities. *Id.* ¶ 21.

Plaintiffs brought this case as a putative class action under ERISA. Compl. ¶ 1. They sued Georgetown University; Christopher Augostini, the University's former chief administrative officer and a former plan fiduciary; and Geoff Chatas, the University's current chief administrative officer and a plan fiduciary (collectively, Georgetown). *Id.* ¶¶ 22-26.[1]

Plaintiffs' original complaint pleaded two counts for breach of the duty of prudence. *See* Compl. ¶ 1. In Count 1, they alleged that Georgetown caused plan participants to incur excessive recordkeeping fees. *Id.* ¶ 121. They asserted that Georgetown should not have allowed TIAA, Vanguard,

---

[1]    Plaintiffs' proposed complaint drops the allegations against Chatas. Dkt.42 at 2 n.1.

and Fidelity to each provide recordkeeping services or to charge asset-based fees (*i.e.*, fees based on a percentage of the value of the accounts). *Id.* Instead, they contended, Georgetown should have consolidated to a single recordkeeper and paid a flat fee of "approximately $35 per participant" per year. *Id.* ¶ 53.

In Count 2, Plaintiffs alleged that Georgetown mismanaged the Plans' investment portfolios. Compl. ¶ 126. In particular, they alleged that Georgetown acted imprudently by (1) offering "retail" share classes of certain Vanguard mutual funds instead of "institutional" share classes with lower investment-management fees, *id.* ¶¶ 64-69; (2) offering too many investment options, *id.* ¶ 42; (3) offering two investment options (the CREF Stock Account and the TIAA Real Estate Account) that they claimed underperformed compared to alternatives, *id.* ¶¶ 132-33; and (4) offering the TIAA Traditional Annuity in the Defined Contribution Plan in light of its withdrawal restrictions, *id.* ¶ 134.

### 2. The District Court's First Decision

Georgetown moved to dismiss the complaint for lack of standing and for failure to state a claim. Dkt.18. The district court granted the motion. Dkt.35.

11

The district court held that Plaintiffs lacked Article III standing to bring some of their claims because they had not alleged any related injuries. Dkt.35 at 17-22. The court explained that Plaintiffs could not bring claims about institutional versus retail share classes of Vanguard funds, because neither Plaintiff had invested in any Vanguard funds. *Id.* at 19. It then determined that Plaintiff Wilcox lacked standing to challenge the withdrawal restrictions in the TIAA Traditional Annuity because he did not allege that he had "attempted [any] withdrawal or intend[ed] to leave his job and withdraw his funds." *Id.* at 19. And the court concluded that Plaintiffs could not challenge the supposed underperformance of the TIAA Real Estate Fund because that fund outperformed Plaintiffs' preferred alternative during the class period and so they had not alleged any injury. *Id.* at 20-22.

The district court dismissed the remaining claims for failure to state a claim. Dkt.35 at 22-27. The court first held that Plaintiffs' recordkeeping-fee claim "ha[d] no factual support, [was] entirely speculative, [and was] contrary to caselaw and common sense." *Id.* at 27. It explained that a key feature of the Plans is that they offer TIAA annuities, which are "long-term investments" and therefore more expensive to recordkeep than "short-term investments" such as mutual funds. *Id.* at 16, 25. Plaintiffs had not "iden-

tified any college or university" that had consolidated to a single record-keeper for $35 per year while providing the same offerings as the Plans, or even "cite[d] [an] example of any non-TIAA entity performing recordkeeping for TIAA annuities." *Id.* at 25-27; *see id.* at 26 (noting that "no other vendor has ever recordkept TIAA annuities" (quoting *Sacerdote v. N.Y. Univ.*, 328 F. Supp. 3d 273, 303 (S.D.N.Y. 2018), *aff'd in relevant part*, 9 F.4th 95 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022))).

The district court then held that Plaintiffs' theory of too many investment options failed because Plaintiffs had not alleged "that they were confused or overwhelmed by the available investment options or that they were unable to make decisions regarding those options." Dkt.35 at 11-12 n.8. And it explained that the theory that the CREF Stock Account underperformed failed, both because the theory was based on an apples-to-oranges comparison to funds with different investment strategies, and because a fund's failure to perform as well as investors had hoped "does not indicate imprudence on the part of Defendants." *Id.* at 22-23.

Although the district court dismissed the complaint without prejudice, Dkt.36, it entered an order closing the case, 1/8/2019 Dkt. Entry. Thirty days later, Plaintiffs filed a motion for leave to amend their complaint with the proposed complaint. Dkt.37. The district court denied the motion. It

13

explained that because its earlier dismissal had been "final and appealable," Plaintiffs were required to either file a motion to amend the judgment within 28 days under Federal Rule of Civil Procedure 59(e) or justify reopening the judgment under Rule 60(b). Dkt.42 at 6-7, 8-10. Because Plaintiffs did neither, the court denied their motion. *Id.* at 7-10.

Plaintiffs appealed the denial of the motion for leave to amend. This Court reversed, holding that the district court's motion-to-dismiss order had not been a final, appealable order. *Wilcox v. Georgetown Univ.*, 987 F.3d 143, 149-52 (D.C. Cir. 2021). The Court vacated the district court's order denying leave to amend and remanded. *Id.* at 152.

### 3.    Plaintiffs' Proposed Amended Complaint

This case was reassigned to a new judge on remand. 10/27/2021 Dkt. Entry. Plaintiffs refiled their motion for leave to amend and proposed complaint. Dkt.58. The proposed complaint contains three counts – the original two counts alleging breach of the duty of prudence and a new count alleging breach of a duty of candor. Dkt.76 at 9-13.

Count 1 continues to allege that Georgetown acted imprudently by not consolidating recordkeepers and not negotiating a flat per-participant fee of $35 per year. Proposed Compl. ¶¶ 67, 138. It alleges that between 2008

and 2020, the University of Chicago, Loyola Marymount University, Pepperdine University, Purdue University, and the California Institute of Technology (Caltech) moved their retirement plans to a single recordkeeper, and that the University of Notre Dame considered doing so. *Id.* ¶¶ 85-101. It also alleges that between 2012 and 2016 the Plans paid higher recordkeeping fees than the median fee reported by a third-party investment consultant for unspecified defined-contribution plans. *Id.* ¶¶ 12-20.

Count 2 continues to allege that Georgetown failed to prudently manage the Plans' investment portfolios. Proposed Compl. ¶ 144. It contains five theories. It again asserts that Georgetown acted imprudently by (1) offering retail share classes of some Vanguard mutual funds instead of institutional share classes, *id.* ¶ 113-14; (2) offering too many investment options, *id.* ¶¶ 74-75; and (3) offering the TIAA Traditional Annuity in the Defined Contribution Plan despite its withdrawal restrictions, *id.* ¶ 146. It adds two new theories: that Georgetown (4) failed to evaluate certain required disclosures by TIAA and Fidelity and discover that those disclosures were inaccurate or incomplete, *id.* ¶¶ 21-23, and (5) failed to recognize that TIAA's variable annuities "are not really annuities at all," *id.* ¶ 54. It drops the previous theory about the supposed underperformance of the CREF Stock Account and the TIAA Real Estate Account. Dkt.76 at 10.

15

The third count is a new claim for breach of a "duty of candor." Proposed Compl. ¶ 152. It alleges that Georgetown inaccurately reported its recordkeepers' compensation on Form 5550, a form Georgetown filed with the Department of Labor. *Id.* ¶¶ 151-53.

### 4.   The District Court's Second Decision

The district court carefully evaluated Plaintiffs' proposed complaint, then denied leave to amend in a comprehensive written opinion. *See* Dkt.76. The court concluded that the proposed amendments would be futile because Plaintiffs still lack standing and because the proposed complaint still fails to state a valid claim. *Id.* at 2.

First, the district court concluded that the proposed complaint does not cure Plaintiffs' lack of Article III standing. Dkt.76 at 18-22. The court explained that the proposed complaint still does not allege that either Plaintiff invested in any Vanguard funds, *id.* at 18-20, or that Plaintiff Wilcox had sought or will seek to redirect or withdraw funds invested in the TIAA Traditional Annuity, *id.* at 20-22. The court noted that Plaintiffs did not "attempt to cure the standing problems previously identified" by adding new allegations. *Id.* at 19; *see id.* at 22 (noting that no allegations "have been added in the proposed amended complaint" about whether Plaintiff Wilcox wishes to withdraw funds from the Traditional Annuity).

16

The district court then held that the remaining allegations fail to state a claim under ERISA. Dkt.76 at 22-47. The court found many deficiencies with Count 1, the recordkeeping-fee claim. *Id.* at 22-33. First, the court noted that although the proposed complaint includes examples of other university plans that had consolidated to one recordkeeper, it does not plausibly allege that those plans are comparable to the Plans. *Id.* at 26. Specifically, it does not include "facts comparing the scope and quality of the recordkeeping services being provided," "the number and variety of funds or tools and options offered to plan members," "the number of participants in the plans," "the total amount of assets under management," or even "the recordkeeping fees paid by the plans." *Id.* Second, the court explained that the allegations "do not answer the question of whether the single record-keeper . . . can perform the recordkeeping function for the TIAA annuities." *Id.* Third, the allegations do not "supply the detail needed to support using $35 as a benchmark." *Id.* Fourth, the allegations about asset-based fees were inconsistent and did not show that the fees were excessive "in relation to the specific services being provided." *Id.* at 30-33.

The district court likewise concluded that Count 2 fails to state a claim. Dkt.76 at 33-44. First, the court held that the theory that the Plans offer too many investment options fails because the proposed complaint still

17

does not allege that Plaintiffs were "unable to decide which options to select" or provide "factual support" to show that the "array of options is not appropriate for [plans] of this size and the diversity of [their] members." *Id.* at 34. Second, the court held that the theory that Georgetown failed to investigate TIAA's disclosures fails because ERISA's fiduciary duties do not include "reviewing third-party disclosures" and because Plaintiffs did not explain how they "were harmed by the alleged failure to obtain or closely review the 408b-2 disclosures." *Id.* at 37-39. Third, the court held that the theory that TIAA mislabeled its variable annuities fails because "Georgetown did not name the investment vehicle," TIAA did; ERISA's fiduciary duties do not include "put[ting] investors on notice that they should look at an investment option's prospectus and not simply the label applied by TIAA"; TIAA's variable annuities are not mislabeled; and Plaintiffs alleged no harm from the supposed mislabeling. *Id.* at 41-44.

Finally, the district court held that Count 3 fails to state a claim. Dkt.76 at 45-46. First, the court explained that ERISA's fiduciary duties include duties of "prudence, loyalty, and impartiality," but not a freestanding duty of candor. *Id.* at 45 (citing Restatement (Third) of Trusts §§ 77-79 (2007)). Second, the court held that "even if the duty of candor is cognizable under ERISA," Plaintiffs have not "supplied any legal basis for the Court to

find" that the duty of candor applies to filing a Form 5500 with the Department of Labor. *Id.* at 46. The court explained that filing a Form 5500 does not involve any "fiduciary function" or any "duty owed to Plan participants as opposed to the federal government." *Id.* at 46 (quoting Proposed Compl. ¶ 105).

Although the district court denied the motion for leave to amend the complaint, it did so "without prejudice to a renewed motion proposing an amended complaint that includes the necessary details." Dkt.76 at 30. Plaintiffs did not file a renewed motion to amend their complaint.

## SUMMARY OF ARGUMENT

The district court correctly determined that, despite two attempts, Plaintiffs have not alleged any viable theory for breach of ERISA's duty of prudence.

I. Plaintiffs lack Article III standing to bring two of their claims because they do not allege any injury-in-fact with respect to them.

First, Plaintiffs lack standing to challenge the Vanguard share classes. They do not allege that they invested in any Vanguard mutual funds, so they could not have been injured by the inclusion in the plans of higher-fee retail classes instead of lower-fee institutional classes. Plaintiffs argue that it is enough for them to allege injury from Georgetown's other supposed

misconduct. That is incorrect: They must allege some injury stemming from the specific challenged conduct to be able to bring claims based on that conduct. In any event, Plaintiffs do not allege that the Plans would even have been eligible for the institutional classes.

Second, Plaintiffs lack standing to challenge the withdrawal restrictions in the TIAA Traditional Annuity in the Defined Contribution Plan. Plaintiffs allege that only one of them (Wilcox) invested in the TIAA Traditional Annuity, and do not allege that he did so through the Defined Contribution Plan. That omission is significant, because only the Traditional Annuity *in the Defined Contribution Plan* contains withdrawal restrictions. They also do not allege that Wilcox has sought or will seek to withdraw any investments. Plaintiffs argue that he nonetheless has standing to seek injunctive relief, but they are mistaken: A plaintiff must establish injury to seek injunctive relief, and there is no exception to that rule for ERISA claims. In any event, Plaintiffs fail to allege that the withdrawal restrictions are unlawful under ERISA; the regulation they cite does not apply to the Traditional Annuity by its terms.

II. The district court correctly dismissed Plaintiffs' remaining claims and determined that amendment would be futile because the proposed complaint fails to state a claim.

A.  Count 1, which alleges excessive recordkeeping fees, fails because Plaintiffs do not allege any meaningful benchmark.  They do not allege facts to show that a plan comparable to the Plans paid lower fees for comparable services.  Their allegations about other universities' plans consolidating to single recordkeepers do not allege the funds provided, the scope of record-keeping services provided, the size of the plans, or even the recordkeeping fees paid by the plans.  Without that detail, there is no way to perform an apples-to-apples comparison that could raise the inference that the Plans' recordkeeping fees are imprudent.  Similarly, Plaintiffs' allegations about the median fees paid by other plans are insufficient because Plaintiffs allege no facts to show that those other plans were comparable to the Plans.

Without a meaningful benchmark, all Plaintiffs' allegations show is that Georgetown could have reduced recordkeeping fees by drastically changing the Plans, including by reducing or eliminating investment options.  That does not raise the inference that the fees were excessive for *these* Plans.

Plaintiffs principally rely on decisions from other courts that permitted recordkeeping-fee claims to proceed to discovery or to trial.  Those decisions are materially distinguishable; are not binding on this Court; and

should not be followed to the extent the courts relied on merely conclusory allegations.

B.   Count 2's theories of imprudence likewise fail to state a claim. First, Plaintiffs' theory that Georgetown offered too many investment options fails because one of ERISA's core principles is participant choice, and Plaintiffs do not allege that they were confused, overwhelmed, or otherwise harmed by the number of investment options.  The district court pointed this out, and Plaintiffs have no response.

Second, Plaintiffs' theory that Georgetown did not audit disclosures from TIAA or Fidelity about their compensation for recordkeeping services fails because ERISA does not impose that duty on Georgetown.  It also fails because Plaintiffs do not connect this allegation to any breach of fiduciary duty and do not allege any harm.  Again, the district court pointed out these issues, and Plaintiffs have no response.

Third, Plaintiffs' theory that Georgetown misunderstood that TIAA's variable annuities are not actually annuities fails for several reasons.  The investments meet the dictionary definition of "annuity"; Plaintiffs do not identify any fiduciary obligation that Georgetown breached; and Plaintiffs do not allege any resulting harm.

22

C.  Finally, Count 3's theory about Georgetown's supposed breach of a duty of candor fails.  ERISA contains no independent duty of candor, and even if it did, that duty would not apply to filing Form 5550 with the government, which is a ministerial rather than fiduciary function.  Besides, Plaintiffs do not allege any harm.

The Court should affirm the district court's judgment.

## ARGUMENT

*Standard Of Review*

This Court reviews the grant of a motion to dismiss for lack of subject-matter jurisdiction and for failure to state a claim *de novo*.  *Cares Cmty. Health v. U.S. Dep't of Health & Hum. Servs.*, 944 F.3d 950, 957 (D.C. Cir. 2019).  The Court similarly reviews the denial of a motion for leave to amend on the basis of futility *de novo*.  *Osborn v. Visa Inc.*, 797 F.3d 1057, 1062-63 (D.C. Cir. 2015).

## I.    PLAINTIFFS LACK ARTICLE III STANDING

To establish Article III standing, a plaintiff must show an "injury in fact" that is "fairly traceable to the challenged conduct of the defendant" and that likely would be "redressed by a favorable decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  The fact that ERISA provides a plaintiff with a cause of action does not excuse the plaintiff from establishing injury, *see*

23

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2214 (2021); "[t]here is no ERISA exception to Article III," *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020).

Here, the district court correctly held that Plaintiffs lack standing because they fail to allege injury-in-fact with respect to their claims about the Vanguard share classes or the withdrawal restrictions on the TIAA Traditional Annuity in the Defined Contribution Plan.  Dkt.35 at 17-22.

## A.  Plaintiffs Lack Standing To Challenge The Vanguard Share Classes

Plaintiffs allege that Georgetown acted imprudently by including retail classes of Vanguard mutual funds that had higher investment-management fees than institutional classes of the same funds.  Proposed Compl. ¶¶ 113-16.  But neither Plaintiff alleges that he invested in Vanguard mutual funds.  Dkt.76 at 19.  Plaintiffs thus cannot establish any injury from the inclusion of the retail classes.  *Id.* at 19-20.  The district court explained this problem in its initial decision, Dkt.35 at 19, but Plaintiffs did not add new allegations to "attempt to cure the standing problems previously identified," Dkt.76 at 19.

Plaintiffs argue (Br. 48-50) that because they have alleged *other* injuries related to Georgetown's alleged mismanagement of the Plans (such as overpaying recordkeeping fees), they have standing to bring claims related

24

to the Vanguard funds.  They cite (*id.*) out-of-circuit decisions that allowed ERISA plaintiffs who alleged injury from a fiduciary's conduct to bring claims on behalf of others allegedly injured by that conduct, but in a different way.  *See Boley v. Univ. Health Servs., Inc.*, 36 F.4th 124, 131-32 (3d Cir. 2022); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009).[2]

But Plaintiffs here do not claim *any* injury from the challenged conduct, which distinguishes this case from *Boley* and *Braden*.  For example, the *Boley* plaintiffs alleged that the fiduciary lacked a prudent process for evaluating investment options, which led to the inclusion of multiple funds with excessive investment fees.  36 F.4th at 131.  The Third Circuit held that because the plaintiffs each had invested in at least one of those funds, they had standing to bring the claim as to all of the funds "that were allegedly imprudent due to the same decision[] or course[] of conduct."  *Id.* at 131-32; *see Braden*, 588 F.3d at 594 (plaintiff who has alleged an injury may bring claims for all injuries "causally related to the conduct he seeks to challenge").

As the district court explained (Dkt.76 at 20 n.9), that principle has no application here.  A plaintiff can challenge conduct that affects the plan

---

[2]   Plaintiffs also cite (Br. 50 n.14) a number of district court decisions to the same effect.

as a whole once the plaintiff has been injured by that conduct, even if the "relief sought sweeps beyond the [plaintiff's] own injury." *Boley*, 36 F.4th at 132 (quoting *Braden*, 588 F.3d at 593). But *Boley* and *Braden* did not hold that plaintiff can challenge conduct when the plaintiff "lack[s]" a "predicate injury of [his or her] own" caused by that conduct. Dkt.76 at 20 n.9. In that situation, the plaintiff lacks the "personal stake" necessary to establish standing. *City of L.A. v. Lyons*, 461 U.S. 95, 101 (1983) (internal quotation marks omitted). Here, Plaintiffs cannot claim any injury from the inclusion of the Vanguard retail-class funds because the fees for those funds were charged only to investors in the funds and Plaintiffs do not allege that the inclusion of those funds in the Plans led to higher fees for other funds. *See* Proposed Compl. ¶¶ 113-16.

Plaintiffs say (Br. 48) it is enough that they generally alleged "mismanagement" of the Plans. But "there is no cause of action for 'overall [p]lan mismanagement.'" *Barrett v. Pioneer Nat. Res. USA, Inc.*, No. 17-cv-1579, 2018 WL 3209108, at *4 (D. Colo. June 29, 2018). Instead, Plaintiffs must bring claims based on "specific acts." *Id.* (citing 29 U.S.C. § 1109(a)). Here, the specific act Plaintiffs challenge with respect to the Vanguard funds is the inclusion of certain share classes, and that act did not injure them.

Plaintiffs argue (Br. 51) the district court's holding "elevates pointless abstract legal formalism" that would make it more difficult for plaintiffs to bring ERISA claims. But Article III standing is a constitutional requirement "built on . . . the idea of separation of powers," *Raines v. Byrd*, 521 U.S. 811, 820 (1997) (internal quotation marks omitted); it ensures that courts do not "usurp the powers of the political branches," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). The Supreme Court accordingly has "long rejected" arguments to lower Article III standing requirements to make it easier for certain plaintiffs to sue, including in the ERISA context. *Thole*, 140 S. Ct. at 1621-22.

Even if Plaintiffs have standing to challenge the Vanguard share classes, their claim fails. They do not allege that the Plans would even have qualified for the institutional share classes for all the Vanguard funds. *See* Proposed Compl. ¶¶ 113-15. Plaintiffs speculate that Vanguard might have made those share classes available to the Plans, *see id.* ¶ 116, but a complaint cannot rest on mere speculation, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1332 (D.C. Cir. 2015) (this Court can affirm on an alternative ground supported by the record).

## B.   Plaintiffs Lack Standing To Challenge The Withdrawal Restrictions On The TIAA Traditional Annuity

Plaintiffs also allege that Georgetown acted imprudently by offering the TIAA Traditional Annuity in the Defined Contribution Plan because it only allows participants to redirect funds in ten annual installments while they are employed at the University and charges a 2.5% fee if they withdraw the funds when they retire or leave the University. *See* Proposed Compl. ¶ 117. Neither Plaintiff can show that he was injured by those restrictions. *See* Dkt.35 at 22; Dkt.76 at 21-22.

Plaintiffs do not dispute that Plaintiff McGuire cannot show any injury because he never invested in the Traditional Annuity. Dkt.35 at 22; *see* Opening Br. 51-55.

Plaintiffs allege that Plaintiff Wilcox invested in the Traditional Annuity product. Proposed Compl. ¶ 39. But Plaintiffs do not allege that Wilcox invested through the Defined Contribution Plan – and only the Defined Contribution Plan version of the product contains the withdrawal restrictions. *Id.* ¶ 60. If Wilcox invested only through the Voluntary Plan, he would not be subject to the withdrawal restrictions and thus could not claim any injury. Although Georgetown identified this gap in Plaintiffs' allegations, *see* Dkt.18-1 at 16, the proposed complaint still does not address the issue.

In addition, Plaintiffs do not allege that Wilcox sought to or will seek to withdraw or redirect funds from the TIAA Traditional Annuity. Dkt.35 at 8, 22. Plaintiffs allege only that if Wilcox seeks to withdraw the funds in the future, he will be subject to the withdrawal restrictions. Proposed Compl. ¶ 121. But as the Supreme Court and this Court have explained, a "hypothetical future harm" is insufficient to establish an injury for Article III purposes. *Clapper*, 568 U.S. at 416; *see Attias v. Carefirst, Inc.*, 865 F.3d 620, 626 (D.C. Cir. 2017). Instead, the plaintiff must show that the risk of future injury is "imminent" – meaning that it is "certainly impending" or that there is a "substantial risk" it will occur. *Attias*, 865 F.3d at 626-27 (quoting *Clapper*, 568 U.S. at 410, 414 n.5).

The whole point of an annuity is for the funds to be converted to monthly payments upon retirement. *NationsBank*, 513 U.S. at 254. So Plaintiffs needed to provide some reason to believe that Wilcox would seek to withdraw the funds before retirement and lose the intended benefits of the product. Again, Georgetown (Dkt.18-1 at 16) and the district court (Dkt.35 at 19-20) identified this issue, and Plaintiffs did not add any allegations in their proposed complaint. *See* Proposed Compl. ¶ 39. "[T]he fact that" no new allegations "have been added in the proposed amended complaint means that there is no basis for a plausible inference that Wilcox has

been harmed" by the withdrawal restrictions.  Dkt.76 at 22.  Particularly where Plaintiffs have had multiple chances to plead their claims, this Court should not "supply facts that [Plaintiffs] failed to plead." *Gudger v. Dist. of Columbia*, 74 F. Supp. 3d 47, 52 (D.D.C. 2014).

Plaintiffs argue (Br. 53-54) that even if Wilcox has not yet suffered an injury from the withdrawal restrictions, he still has standing to pursue injunctive relief under 29 U.S.C. § 1132(a)(3).  Plaintiffs did not make this argument in the district court, *see* Dkt.58-1, and so it is forfeited, *see Gov't of Man. v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019).  It also is incorrect. *Every* plaintiff invoking a federal court's power must establish injury "for each form of relief that is sought." *Finnbin, LLC v. CPSC*, 45 F.4th 127, 136 (D.C. Cir. 2022) (internal quotation marks omitted).

Plaintiffs cite (Br. 53-54) decisions from other courts of appeals holding that a plaintiff need not allege injury to seek injunctive relief under ERISA for breach of fiduciary duty.[3]  But those decisions have been superseded by *TransUnion*, where the Supreme Court explained that a bare statutory violation, without a cognizable "adverse effect," cannot establish

---

[3]  *See Peters v. Aetna, Inc.*, 2 F.4th 199, 220-21 (4th Cir. 2021); *Faber v. Metro Life Ins.*, 648 F.3d 98, 102 (2d Cir. 2011); *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 610 (6th Cir. 2007); *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 456 (3d Cir. 2003).

standing. 141 S. Ct. at 2214. Plaintiffs also suggest (Br. 54-55) that the Supreme Court in *Hughes v. Northwestern University*, 595 U.S. 170 (2022), embraced their theory of standing, but the Court did not even address standing. *See id.* at 174.

Finally, even if Plaintiffs had standing to challenge the withdrawal restrictions, Plaintiffs fail to plead a breach of fiduciary duty. Plaintiffs' only theory of imprudence (Br. 51-52) is that the annuity's withdrawal restrictions are unlawful under 29 C.F.R. § 2550.408b-2(c)(3). That regulation does not apply here. By its terms, it applies only to contracts between a plan and third parties for a "service" that is "necessary for the establishment or operation of the plan." *Id.* § 2550.408b-2(a). The TIAA Traditional Annuity is an insurance contract between TIAA and the plan participant, Dkt.35 at 6-7, not a contract between TIAA and the Plans for a necessary service for the *plans*. So Plaintiffs' theory of fiduciary breach is invalid as a matter of law.

## II. THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' CLAIMS AND DETERMINED THAT AMENDMENT WOULD BE FUTILE

Plaintiffs seek to bring three counts for breach of fiduciary duties: two counts for breach of the duty of prudence, and one count for breach of a duty

of candor. Proposed Compl. ¶¶ 138-53. To proceed to discovery, their pleadings must contain "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Although Federal Rule of Civil Procedure 15 provides that courts "should freely give" leave to amend a complaint, Fed. R. Civ. P. 15(a)(2), a court may deny leave to amend when amendment would be futile, meaning that the proposed complaint would not survive a motion to dismiss, *Aguiar v. DEA*, 992 F.3d 1108, 1113-14 (D.C. Cir. 2021).

The district court correctly held that Plaintiffs' original complaint failed to adequately plead any of their claims, Dkt.35, and that amendment would be futile because their proposed complaint does not cure the deficiencies identified, Dkt.76. Because the ultimate question is whether the proposed complaint adequately states any claims, the focus is on the allegations in that complaint. *See* Opening Br. 28-48.

## A.    Plaintiffs Fail To State A Claim Based On Recordkeeping Fees

In Count 1, Plaintiffs allege Georgetown breached its duty of prudence by allowing TIAA, Fidelity, and Vanguard to separately recordkeep participants' accounts on their platforms and to charge asset-based fees, instead of consolidating to a single recordkeeper at a flat, per-participant fee of $35 per year.

32

1. **Plaintiffs Fail To Plead Facts Showing That Comparable Plans Paid Lower Fees For Comparable Services**

a.    ERISA's duty of prudence includes a duty to monitor plan investments and recordkeeping fees. *Hughes*, 595 U.S. at 175-76 (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015)). "ERISA does not impose a duty to take any particular course of action." *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (internal quotation marks omitted). Instead, the plaintiff must allege that the fiduciary's choice was so outside "the range of reasonable judgments," *Hughes*, 595 U.S. at 177, that the court can infer that the fiduciary failed to follow a prudent process, *see PBGC*, 712 F.3d at 719-20. The standard for pleading imprudence "will necessarily be context specific," because whether an act was prudent depends on what a prudent fiduciary could do in similar circumstances. *Dudenhoeffer*, 573 U.S. at 425 (quoting 29 U.S.C. § 1104(a)(1)(B)).

As the district court recognized, in order to show that Georgetown acted imprudently by having multiple recordkeepers, Plaintiffs had to allege facts to show that Georgetown plausibly could have consolidated recordkeepers and reduced fees while maintaining the same investments and participant services. Dkt.35 at 25. That is, Plaintiffs had to allege "a meaningful benchmark" to which to compare the challenged fees. *Matney*

33

*v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1148 (10th Cir. 2023) (internal quotation marks omitted).  Simply alleging that other plans paid lower fees is not enough; a plaintiff must allege facts showing that the other plans were similar to the plaintiff's plan and that "the recordkeeping services rendered by the chosen comparators [were] similar to the services offered by the plaintiff's plan."  *Id*.  A court "cannot infer imprudence unless similarly sized plans spend less on the same services"; "the key to stating a plausible excessive-fees claim is to make a like-for-like comparison."  *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022).

Requiring an apples-to-apples comparison makes sense.  ERISA gives plan administrators the flexibility to make "tradeoffs" to best serve their participants.  *Hughes*, 595 U.S. at 177.  Thus, the fact that one plan paid lower fees than another plan could reflect one administrator's reasonable choice to operate a no-frills plan with fewer options and services and the other administrator's reasonable choice to operate a higher-cost plan with a wider variety of choices and services – rather than imprudence on the part of either administrator.  *See Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022).

b.    The Plans have a number of features that are relevant to the amount of recordkeeping fees.  Dkt.35 at 25.  They offer TIAA annuities,

34

which are "long-term" investments "based on decades worth of investments" and are more expensive to recordkeep than "short-term investments" such as mutual funds.  *Id.* at 25-26.  The TIAA Traditional Annuity is "by far" the most popular investment option in the Plans, Proposed Compl. ¶ 20 n.8, and only TIAA can recordkeep TIAA annuities, Dkt.35 at 26.  The Plans also offer a wide range of investment options from three investment platforms, so recordkeeping services must cover accounts on all three platforms.  *Id.* at 25, 27.  And the Plans provide many services to participants, such as "individual investment advice," which are covered by recordkeeping fees.  *Id.* at 26 (internal quotation marks omitted).  Plaintiffs recognize that these features affect the amount of fees.  *See* Proposed Compl. ¶ 64 (recordkeeping costs "depend[] on the number of retirement plan participants, the number of investment choices, [and] the complexity of plan features").

In order to plead imprudence, Plaintiffs had to allege facts to show "that Georgetown could continue to offer the same Plans and the same associated services for $35/year."  Dkt.35 at 25, 27.  In the original complaint, Plaintiffs did not allege facts from which a court could infer that "three entirely different current investment platforms – TIAA, Vanguard, and Fidelity – would agree to continue the same offerings at a lesser, or combined recordkeeping price," or that any other recordkeeper would do so.  *Id.* at 27.

35

The original complaint did not provide any examples of other retirement plans that had consolidated recordkeepers or that paid recordkeeping fees of $35 per year. *See id.*

Although Plaintiffs added allegations in the proposed complaint about other universities, they still do not plead sufficient factual content to permit a meaningful comparison between the Plans and the other universities' plans. Dkt.76 at 26; *see* pp. 37-41, *infra*. Without those facts, a court cannot infer that Georgetown could have obtained similar recordkeeping arrangements for the Plans.

At most, the allegations suggest that other universities "operate in a different fashion," not that "the decision to consolidate recordkeeping services would be equally beneficial or feasible for Georgetown" or that "Georgetown's approach constitutes *mis*management as opposed to different management." Dkt.76 at 26. Perhaps Georgetown could have consolidated recordkeepers and paid lower fees by "transform[ing] [the Plans] from what they are to something else" – for example, it could have abandoned TIAA annuities (which only TIAA can recordkeep), pared investment options down significantly, and stopped providing additional participant services. Dkt.35 at 26-27. But ERISA does not require plan administrators to operate the lowest-cost plans possible. *See Albert v. Oshkosh Corp.*, 47 F.4th

36

570, 579 (7th Cir. 2022). Instead, ERISA gives each fiduciary the discretion to select the right balance of costs and services for plan participants. Plaintiffs may prefer low-cost, limited-option plans, but it was not imprudent for Georgetown to make a different choice.

### 2. The New Allegations Do Not Plausibly Plead Imprudence

The proposed complaint adds two new types of allegations. First, it provides six examples of other university retirement plans that either consolidated to a single recordkeeper or considered doing so. Proposed Compl. ¶¶ 85-101. Second, it provides the median fees paid by unspecified defined-contribution plans in 2012, 2014, and 2016, as reported by a third-party consulting firm. *Id.* ¶¶ 12-13. Neither type raises a plausible inference of imprudence.

### a. Plaintiffs' allegations about other universities' plans do not permit a meaningful comparison to the Plans

For Plaintiffs to plausibly plead their recordkeeping-fee claim, they need to provide examples of comparable retirement plans with lower record-keeping fees. That means plans that are similar in size to the Plans; offer TIAA annuities, a comparable menu of other investment choices, and similar participant services and tools; and pay lower fees. Dkt.35 at 26-27. Yet the proposed complaint lacks basic details about the other universities'

37

plans, including their "size," "number of participants," or "total amount of assets"; "the number and variety of funds or tools and options" they offered to participants; and "the scope and quality of the recordkeeping services [they] provided." Dkt.76 at 26. In fact, for all but one of the proposed comparators, the complaint does not even allege "the recordkeeping fees paid by the plans." *Id.* Without that information, there is no factual basis to infer that the other plans are comparable to the Plans or that Georgetown could have consolidated to one recordkeeper that would cost only $35 per year.

**University of Chicago.** The entirety of Plaintiffs' allegations about the University of Chicago are that its plans had $2.4 billion in assets and that in 2020 (two years after Plaintiffs filed their complaint in this case), it "eliminat[ed] one of two plan recordkeepers" and "reduced annual record-keeping fees on [its] two 403(b) plans to $21-$44 per participant." Proposed Compl. ¶ 67; *see id.* ¶¶ 27, 85.

Those meager allegations do not permit any meaningful comparison to the Plans. The proposed complaint does not allege how many or what type of investment options the University of Chicago's plans offered; whether the plans offered TIAA annuities; or what services its recordkeeper provided. *See* Proposed Compl. ¶¶ 27, 67, 85. So nothing indicates that the

University of Chicago's plans were "sufficiently similar" to the Plans. Dkt.76 at 28.

**Loyola Marymount and Pepperdine.** The proposed complaint alleges that in 2009, Loyola Marymount and Pepperdine both consolidated to one recordkeeper, a company called Diversified. Proposed Compl. ¶¶ 88, 91. The complaint provides no other details about either university's plan, except that Loyola Marymount's plan did not offer TIAA annuities. *Id.* ¶ 89. The complaint thus provides no basis for concluding that those universities' plans were comparable to the Plans – and the fact that Loyola's plan did not offer TIAA annuities shows that it was *not* comparable. *See* Dkt.36 at 25. The complaint also does not allege what fees Loyola Marymount or Pepperdine paid or even that they were lower than the Plans' fees – so it provides no factual support for the inference that Georgetown could have consolidated to one recordkeeper and offered lower fees.

**Purdue.** Plaintiffs allege that in 2008, Purdue "decided to transition from five providers" to "a single administrative service provider," which "caused recordkeeping expenses to decline significantly." Proposed Compl. ¶ 95. But the few details in the proposed complaint show that Purdue's plan was not comparable to the Plans. The complaint alleges that after Purdue

39

transitioned to Fidelity as its sole recordkeeper, its plan offered just 19 investment options, *id.* – far fewer than the Plans, *see id.* ¶ 74.  It also does not say that Purdue offered TIAA annuities as options, even though those are popular features of the Plans and can only be recordkept by TIAA.  Dkt.35 at 26.  Finally, the complaint does not allege Purdue's fees, so there again is no basis for concluding that they were lower than the Plans'.

**Caltech.**  The proposed complaint alleges that in 2010, Caltech consolidated to TIAA as its sole recordkeeper and then "eliminated over 100 Fidelity mutual fund options."  Proposed Compl. ¶ 97.  It also alleges that between 2013 and 2015, Caltech "negotiated over $15 million in revenue sharing rebates from TIAA[]."  *Id.*  The complaint provides no other details that would indicate that Caltech's plan was comparable to the Plans.  In particular, it includes no allegations about the amount of fees Caltech paid.

**Notre Dame.**  The proposed complaint alleges that at some unspecified time, Notre Dame engaged an independent investment consultant, which issued a report recommending "recordkeeper consolidation."  Proposed Compl. ¶¶ 98-99.  The complaint does not allege that Notre Dame followed that advice, or (if it did) what the results were.

The bottom line is that the proposed complaint lacks the "facts needed" to show that the Plans' fees were excessive compared to those paid

40

by other universities.  Dkt.76 at 28.  It is not as though Plaintiffs lacked access to those facts – much of the missing information is publicly available but does not support Plaintiffs' narrative.[4]  The district court expressly allowed Plaintiffs to seek leave to file a further amended complaint "that includes the necessary details" about the other universities' plans.  Dkt.76 at 30.  But Plaintiffs chose not to do so.

> **b.    Plaintiffs' allegations about unspecified other defined-contribution plans do not permit a meaningful comparison to the Plans**

The proposed complaint alleges that between 2012 and 2016, the Plans paid higher recordkeeping fees than the "median fee" paid by unspecified "defined contribution plans," as reported by "NEPC, LLC," an "investment consulting firm."  Proposed Compl. ¶¶ 12-13.  For example, the complaint alleges that in 2012, the Defined Contribution Plan paid TIAA $267 and Vanguard $97 per participant for recordkeeping services, whereas NEPC reported a median fee of $92.  *Id.* ¶¶ 12, 20.

---

[4]  For example, Pepperdine's disclosures explain that as a result of switching to Diversified, Pepperdine's plans lost access to TIAA annuities, which were frozen to new investments.  Dkt.59 at 19 & n.11.  Further, in 2013, Pepperdine paid $157 per participant to Diversified to recordkeep the new, slimmed-down lineup plus $97 per participant to TIAA to recordkeep the frozen accounts – nowhere near Plaintiffs' $35 benchmark.  *Id.* at 19-20 & nn.12-13.

41

Here again, the proposed complaint provides no basis for inferring that the plans in NEPC's reports are similar to the Plans and thus that the Plans' fees were excessive.  The complaint does not explain which plans NEPC considered, how it selected those plans, whether they were 401(k) or 403(b) plans, what their sizes were, what investment options they provided (including whether they offered TIAA annuities), or what services the recordkeepers provided.  *See* Proposed Compl. ¶¶ 12-13.  Given this "lack[] [of] detail," "courts throughout the country routinely reject" the use of NEPC surveys as "meaningful benchmark[s]."  *Riley v. Olin Corp.*, No. 21-cv-1328, 2022 WL 2208953, at *4 (E.D. Mo. June 21, 2022); *see, e.g.*, *Matousek*, 51 F.4th at 280; *Smith*, 37 F.4th at 1169; *Fritton v. Taylor Corp.*, No. 22-cv-415, 2023 WL 5348834, at *4 (D. Minn. Aug. 21, 2023).  The district court did so here as well.  Dkt.76 at 32.

Further, as the district court noted, Plaintiffs' allegations about the Plans' recordkeeping fees are "something of a moving target."  Dkt.76 at 31.  In one place, the proposed complaint alleges that the Plans paid TIAA 0.35% of asset values for "recordkeeping and administrative" services, Proposed Compl. ¶ 14; in another place, it alleges that the 0.35% charge actually was for "administrative expenses and distribution fees," *id.* ¶ 23(a); and in a

third place, it alleges that the 0.35% charge covered "administrative expense[s]," "distribution expense[s]," "mortality and expense risk," and "investment management," *id.* ¶ 51. The proposed complaint thus is not consistent as to what the Plans paid for recordkeeping, making it impossible to compare them to the median fees reported by NEPC.

### 3.    Plaintiffs' Arguments Lack Merit

Plaintiffs have essentially three responses: (1) other courts have allowed excessive-recordkeeping claims against university retirement plans to proceed to discovery; (2) Plaintiffs did not need to allege specifics of other universities' plans; and (3) even without comparators, their allegations are sufficient. None is correct.

### a.    Decisions in other cases do not make Plaintiffs' allegations plausible

Plaintiffs' principal argument (Br. 22-28, 30-33, 35-39) is that other courts have allowed recordkeeping claims brought against other university retirement plans to proceed to discovery. All of those decisions are distinguishable, and none is binding on this Court.

***Hughes.*** Plaintiffs argue (Br. 22-23) that the Supreme Court in *Hughes* endorsed a recordkeeping-fee claim similar to theirs. That is incorrect – the Court held only that the Seventh Circuit used the wrong legal

standard and did not address the sufficiency of the complaint under the correct standard.  595 U.S. at 177.

The *Hughes* plaintiffs principally challenged the number and variety of investment options in Northwestern's plans.  First Am. Compl. ¶¶ 110-39, *Hughes*, No. 16-cv-8157 (N.D. Ill. Dec. 15, 2016) (ECF No. 38) (*Hughes* Compl.); *see* 595 U.S. at 176.  They also alleged that Northwestern should have consolidated from two recordkeepers to one at a cost of $35 per participant per year.  *Hughes* Compl. ¶¶ 140-54.  The Seventh Circuit initially affirmed the dismissal of the complaint, reasoning that participants could avoid options they did not like by choosing not to invest in them.  *Divane v. Nw. Univ.*, 953 F.3d 980, 987-91 & n.10 (7th Cir. 2020), *rev'd in relevant part sub nom. Hughes*, 595 U.S. at 177.  The Supreme Court rejected that reasoning, explaining that plan administrators have an independent duty to monitor investments and fees.  595 U.S. at 176-77.  Rather than evaluating the complaint's allegations itself, the Court remanded.  *Id.* at 177.

On remand, the Seventh Circuit held that the plaintiffs had stated a claim for excessive recordkeeping fees.  *See Hughes v. Nw. Univ.*, 63 F.4th 615, 631-34 (7th Cir. 2023).  That decision does not aid Plaintiffs for several reasons.  First, the Seventh Circuit relied on critical allegations that are missing here.  The Seventh Circuit emphasized the plaintiffs' allegation

that other recordkeepers "'are *equally* capable of providing a high level of service'" to Northwestern's plans, from which it inferred that the competitors could provide recordkeeping services "comparable to that provided by" Northwestern's existing recordkeepers. *Id.* at 632 (quoting *Hughes* Compl. ¶ 140). That allegation, the Seventh Circuit explained, distinguished *Hughes* from its decision in *Albert v. Oshkosh Corp.*, *supra*, where the complaint "lack[ed] [] 'allegations as to the quality or type of recordkeeping services'" of supposedly comparable plans. *Id.* at 631-32 (quoting *Albert*, 47 F.4th at 579).

Plaintiffs' allegations are more like those in *Albert* than in *Hughes*. Unlike the *Hughes* plaintiffs, Plaintiffs never allege that other recordkeepers are equally capable of providing the services that TIAA, Fidelity, and Vanguard provide to the Plans, and there is no reason to believe they could do so, since Plaintiffs "cite no example of any non-TIAA entity performing recordkeeping for TIAA annuities." Dkt.35 at 25-26. And like the *Albert* plaintiffs, Plaintiffs do not provide any allegations about the quality and type of recordkeeping services of the supposedly comparable university plans. *See* pp. 37-41, *supra*.

Second, the Seventh Circuit relied on allegations that Northwestern not only failed to consolidate recordkeepers, but also failed to seek bids for

45

recordkeeping services and to negotiate rebates from its recordkeepers.  63 F.4th at 633 (explaining that the plaintiffs' claim "is not limited to a failure to consolidate recordkeepers").  The court also relied on the allegation that Northwestern was able to lower its fees during the class period by restructuring its plans.  *Id.* at 632.  Plaintiffs do not make those additional allegations against Georgetown.  *See* Proposed Compl. ¶¶ 101-03.

Further, the Seventh Circuit credited allegations that this Court would not.  For example, the Seventh Circuit credited the plaintiffs' allegation that "$35 per participant was a reasonable recordkeeping fee based on the services provided by existing recordkeepers and the Plans' features," 63 F.4th at 632 – even though the complaint provided no factual support for a $35 per year fee, *see Hughes* Compl. ¶ 148.  This Court "disregard[s] such naked assertions devoid of further factual enhancement."  *Air Excursions LLC v. Yellen*, 66 F.4th 272, 279 (D.C. Cir. 2023) (internal quotation marks omitted); *see Kareem v. Haspel*, 986 F.3d 859, 868 (D.C. Cir. 2021).

**Sweda.**  Plaintiffs note (Br. 26-27) that a divided panel of the Third Circuit allowed a recordkeeping-fee claim brought against the University of Pennsylvania to proceed to discovery.  *Sweda v. Univ. of Penn.*, 923 F.3d 320, 330-32 (3d Cir. 2018).  Again, the allegations there are distinguishable

from the allegations here.  For example, the plaintiffs alleged that the University of Pennsylvania was imprudent in failing to solicit bids or to negotiate rebates, First Am. Compl. ¶¶ 118-19, *Sweda*, No. 16-cv-4329 (E.D. Pa. Nov. 21, 2016) (ECF No. 27) (*Sweda* Compl.) – an allegation missing here. The Third Circuit majority also credited plaintiffs' conclusory assertion that "similar plans" paid a $35 fee "for the same services" provided by the University of Pennsylvania's existing recordkeepers, 923 F.3d at 330, when the complaint provided no factual support for that assertion, *see Sweda* Compl. ¶ 114.  And it drew the unwarranted inference that other universities' plans were "similarly situated" to the University of Pennsylvania's plans, 923 F.3d at 330-32, despite the lack of allegations that would permit a meaningful comparison of the plans, *see Sweda* Compl. ¶¶ 59-67.

**District court decisions.**  Plaintiffs cite (Br. 24-25 nn.7-8, 36-39) district court decisions that allowed recordkeeping-fee claims against university retirement plans to proceed to discovery or to trial, many of which were brought by the plaintiffs' lawyers who brought *Sweda* and *Hughes*. Plaintiffs do not explain what the allegations were in any of those cases or whether they were comparable to those here.

Notably, none of these recordkeeping claims against university retirement plans has ever succeeded on the merits.  Two claims have gone to trial

– *Sacerdote v. New York University*, *supra*, and *Vellali v. Yale University*, No. 16-cv-1345 (D. Conn. filed Aug. 9, 2016) – and the plaintiffs lost both. *See Sacerdote*, 328 F. Supp. 3d at 307; Judgment, *Vellali* (July 13, 2023) (ECF No. 622), *appeal docketed*, No. 23-1082 (2d Cir. July 25, 2023). For example, the *Sacerdote* court found that "no other vendor has ever record-kept TIAA annuities" and that the plaintiffs had not presented "adequate data" to support their claimed $35 per year fee. 328 F. Supp. 3d at 303, 306.

Similarly, the court in *Cunningham v. Cornell University*, No. 16-cv-6525, 2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019), *appeal docketed*, No. 21-88 (2d Cir. Jan. 31, 2021), granted summary judgment to Cornell on the plaintiffs' recordkeeping claim, because there was no evidence that any comparable university retirement plan had paid a recordkeeping fee of $35 per year during the class period. *Id.* at *9-10. These examples underscore that Plaintiffs' claim is implausible.

### b. Plaintiffs must provide a meaningful benchmark to show imprudence

Plaintiffs argue (Br. 29-30, 33) that their allegations about other universities' plans are adequate to plead an excessive-fee claim because they did not need to allege "[s]pecific details" about those plans' recordkeeping services. They cite (*id.*) four out-of-circuit district court decisions, but their reliance on those decisions is misplaced. The plaintiffs in all of the cases

48

identified comparator plans, provided details about those plans' sizes and the fees they paid, and alleged that the comparator plans received similar or comparable recordkeeping services as the plans at issue. *See Brown v. MITRE Corp.*, No. 22-cv-10976, 2023 WL 2383772, at *3-4 (D. Mass. Mar. 6, 2023); *Coppel v. SeaWorld Parks & Ent., Inc.*, No. 21-cv-1430, 2023 WL 2942462, at *13 (S.D. Cal. Mar. 22, 2023); *Coyer v. Univar Sols. USA Inc.*, No. 22-cv-362, 2022 WL 4534791, at *4-5 (N.D. Ill. Sept. 28, 2022); *Lucero v. Credit Union Ret. Plan Ass'n*, No. 22-cv-208, 2023 WL 2424787, at *2-4 (W.D. Wis. Mar. 9, 2023).

Here, by contrast, Plaintiffs do not provide basic information for even *one* allegedly comparable university plan, and they do not allege that the recordkeeping services provided to the Plans and the other universities' plans are similar. *See* pp. 37-41, *supra*. So unlike those other plaintiffs, Plaintiffs simply have not done enough to raise an inference that the Plans' fees were excessive. *See, e.g.*, *Matney*, 80 F.4th at 1148; *Matousek*, 51 F.4th at 279; *Smith*, 37 F.4th at 1169.

### c.    Plaintiffs' remaining allegations do not plausibly state a claim

Plaintiffs argue (Br. 32-35) that even without any comparisons to other universities' plans, the proposed complaint pleads an excessive-fee

claim.  They point (*id.* at 33-35) to their allegations that recordkeeping services are commoditized so consolidating recordkeepers can lower costs, Proposed Compl. ¶¶ 62, 67, and that allowing recordkeepers to charge asset-based fees as opposed to flat fees can lead to high fees, *id.* ¶¶ 64, 66-69.  Neither is sufficient.

First, Plaintiffs' assertion that all recordkeeping services are commoditized is implausible.  As the district court explained, recordkeeping annuities is fundamentally different from recordkeeping mutual funds, because annuities are "long-term" investments "based on decades worth of investments," whereas mutual funds are "short-term investments."  Dkt.35 at 25-26; *see Krutchen v. Ricoh USA, Inc.*, No. 22-cv-678, 2023 WL 3026705, at *2 (E.D. Pa. Apr. 20, 2023) ("[V]aguely alleging recordkeeping services are fungible does not plausibly allege a breach."), *appeal docketed*, No. 23-1928 (3d Cir. May 23, 2023).  Thus, for Plaintiffs' recordkeeping-fee claim to be plausible, they need to allege that someone other than TIAA could recordkeep TIAA annuities.  They do not – and cannot – do so.  Dkt.35 at 25-26; *see Sacerdote*, 328 F. Supp. 3d at 295 ("[L]iterally no other vendor ha[s] ever recordkept TIAA annuities.").

Second, Plaintiffs' allegations about asset-based fees do not show imprudence.  Plaintiffs allege that the costs of providing recordkeeping services generally do not depend on an account's balance, so asset-based fees can lead to fees growing just because the account's investments have prospered, not because there has been any change in the services provided.  Proposed Compl. ¶ 64.  But that does not make asset-based fees "a per se violation of fiduciary duty under ERISA." *Hughes*, 63 F.4th at 624.  On the contrary, asset-based fees are a "common and acceptable investment industry practice[] that frequently inure[s] to the benefit of ERISA plans." *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (internal quotation marks omitted).  They also are particularly advantageous for employees with smaller account balances.  *See Loomis v. Exelon Corp.*, 658 F.3d 667, 672-73 (7th Cir. 2011).  What matters is whether the fees were excessive relative to the services rendered, not how they were calculated.  *See Matney*, 80 F.4th at 1148-49.  That determination requires a meaningful benchmark, which Plaintiffs do not provide.

## B.    Plaintiffs Fail To State A Claim Based On Imprudent Management

In Count 2, Plaintiffs allege that Georgetown imprudently managed the Plans by (1) offering too many investment options, Opening Br. 39-40;

51

(2) failing to audit disclosures from TIAA and Fidelity about their compensation for recordkeeping services, *id.* at 41-43; and (3) failing to recognize that TIAA's variable annuities "are not true annuities," *id.* at 43-45. None of those allegations pleads a valid claim.

### 1.    Georgetown Did Not Act Imprudently By Offering Too Many Investment Options

Plaintiffs argue (Br. 39-40) that Georgetown acted imprudently by offering too many investment options in the Plans because participants could find the options "overwhelming."

Courts repeatedly have dismissed this "paternalistic" theory of imprudence. *Sacerdote v. N.Y. Univ.*, No. 16-cv-6284, 2017 WL 3701482, at *11 (S.D.N.Y. Aug. 25, 2017), *rev'd in part on other grounds*, 9 F.4th at 95; *see, e.g.*, *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 687 (D. Conn. 2018), *appeal docketed*, No. 23-1082 (2d Cir. July 25, 2023). ERISA defined-contribution plans are built around participant choice, *Renfro*, 671 F.3d at 327, and having many options "provides [participants] opportunities to choose the investments that they prefer," *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1350 (N.D. Ga. 2017); *see Vellali*, 308 F. Supp. 3d at 687 (noting the "general presumption in favor of a broader range of options"). Plaintiffs argue (Br. 39) that the Supreme Court in *Hughes* endorsed limiting investment options, but that is wrong; the Court left "untouched" the principle that

"plans may generally offer a wide range of investment options." 63 F.4th at 637; *see* 595 U.S. at 177.

Anyway, as the district court explained, this claim fails because Plaintiffs do not allege that they (or anyone) actually was confused or overwhelmed by the number of choices. Dkt.76 at 33-34; *see Hughes*, 63 F.4th at 637; *Sacerdote*, 2017 WL 3071482, at *11. Plaintiffs have no response to that fatal defect in their claim.

### 2. Georgetown Did Not Act Imprudently By Failing To Audit Disclosures

ERISA and its implementing regulations strictly regulate transactions between plans and their service providers. *See, e.g.*, 29 U.S.C. § 1106(a). In particular, under Rule 408b-2, the service provider "must disclose" to the plan fiduciary, "in writing," a description of its services and compensation. 29 C.F.R. § 2550.408b-2(c)(1)(iv). Plaintiffs allege (Br. 7, 41-42) that TIAA's and Fidelity's Rule 408b-2 disclosures to Georgetown about their compensation for recordkeeping services were inaccurate or incomplete and that Georgetown was imprudent in failing to audit those disclosures. There are two problems with that theory: there is no duty to investigate a service provider's disclosures, and Plaintiffs did not allege any harm.

First, Georgetown did not have a duty under ERISA to audit its recordkeepers' disclosures. Plaintiffs assert (Br. 42) that Rule 408b-2 requires plan fiduciaries to obtain accurate disclosures, but that is not what the rule says. It states that "service providers must" make accurate disclosures for their transactions with plans to be valid, not that plan fiduciaries must ensure that the disclosures are accurate. 29 C.F.R. § 2550.408b-2(c)(1)(iv). Elsewhere, the rule recognizes that plan fiduciaries are not required to look behind service providers' disclosures. For example, the rule states that a transaction is permitted "notwithstanding any failure by a covered service provider" to make accurate disclosures if the fiduciary "did not know" of the inaccurate disclosures and "reasonably believed" that the provider had made accurate disclosures. *Id.* § 2550.408b-2(c)(1)(ix). That safe-harbor provision would make no sense if plan fiduciaries had an affirmative obligation to investigate the accuracy of providers' disclosures. Further, Rule 408b-2 states that its requirements are "independent of [ERISA's] fiduciary obligations." *Id.* § 2550.408b-2(c)(1). So the rule makes clear that whether a *provider's* disclosures are accurate has nothing to do with a *fiduciary's* obligations.

Plaintiffs cite (Br. 43) plan administrators' general duty to monitor and control costs, but they cite no authority stating that that duty includes

the duty to investigate providers' Rule 408b-2 disclosures. Notably, the regulation that sets out the "[i]nvestment duties" of plan fiduciaries "does not specifically identify reviewing third-party disclosures" as one of those duties. Dkt.76 at 37 (citing 29 C.F.R. § 2550.404a-1). Plaintiffs also cite (Br. 41) *Bugielski v. AT&T Services, Inc.*, 76 F.4th 894 (9th Cir. 2023), but that case held that service providers have an obligation "to disclose information to [] fiduciar[ies] about the compensation [they] expect[] to receive" and that the fiduciaries have the obligation "to consider this information," *id.* at 911 – not that fiduciaries must audit the disclosures. Here, Plaintiffs do not allege that Georgetown failed to consider the disclosures.

Second, the proposed complaint does not explain how any alleged failure to investigate Rule 408b-2 disclosures caused Plaintiffs harm. Dkt.79 at 39. The complaint alleges that TIAA's disclosures for various investment options understated its compensation compared to what TIAA disclosed in the prospectuses for those options, and that Fidelity's disclosures were not sufficient for Plaintiffs to estimate its recordkeeping fees. Proposed Compl. ¶¶ 21-23. But it does not allege that any Plaintiff saw or relied on the Rule 408b-2 disclosures or that accurate information was not available to them. (On the contrary, the complaint alleges that the accurate information *was* available in TIAA's prospectuses. *See id.* ¶ 23.) The complaint also does not

link the supposed inaccuracies to conduct by Georgetown. It does not allege, for example, that Georgetown would have negotiated lower fees if it had discovered the supposed inaccuracies.

Plaintiffs' only response (Br. 42-43) is that whether they were harmed is a fact issue not suited for resolution at the pleadings stage. That is wrong. At the pleadings stage, Plaintiffs must allege facts that, if proven, would entitle them to relief on their claim. *Iqbal*, 556 U.S. at 678. "To state a claim for breach of fiduciary duty under ERISA, the plaintiff must establish . . . that the breach caused harm to the plaintiff." *Brosted v. Unum Life Ins. Co. of Am.*, 421 F.3d 459, 465 (7th Cir. 2005). Plaintiffs' failure to allege any harm from the supposed inaccurate disclosures dooms their claim.

Plaintiffs also suggest (Br. 1) that because TIAA's and Fidelity's Rule 408b-2 disclosures were not accurate, the Plans' contracts with TIAA and Fidelity for recordkeeping services were "prohibited transaction[s]" under 29 U.S.C. §§ 1106(a) and 1108(b)(2) that they can seek to enjoin under 29 U.S.C. § 1132(a)(3). But neither the original complaint nor the proposed complaint alleges any prohibited transactions or seeks to bring a claim under 29 U.S.C. § 1132(a)(3). *See* Compl. ¶¶ 119-37; Proposed Compl. ¶¶ 136-53. Rather, both seek only relief for breach of fiduciary duty under 29 U.S.C. §§ 1109(a) and 1132(a)(2). *See id.*

56

### 3.   Georgetown Did Not Act Imprudently By Misunder-standing TIAA's Variable Annuities

Plaintiffs allege (Br. 43-45) that Georgetown acted imprudently by failing to understand that TIAA's variable annuities "are not true annuities" and thus should not be more expensive to recordkeep than mutual funds. Plaintiffs do not state a valid claim for several reasons.

First, as the district court explained, TIAA's variable annuities are annuities. They satisfy the dictionary definition of "annuity," because they are "long-term insurance contract[s] that guarantee[] regular payments at retirement and for the li[ves] of the holder[s]." Dkt.76 at 42-43 (citing *Black's Law Dictionary* (10th ed. 2014)) (internal quotation marks omitted). Annuities have two phases: an accumulation phase, during which the participant makes investments into the annuity, and then a distribution phase that begins at retirement, during which the participant receives regular payments from the annuity for the rest of his or her life. *Lincoln Nat'l Life Ins. v. Transamerica Fin. Life Ins.*, No. 04-cv-396, 2007 WL 710119, at *1 (N.D. Ind. Mar. 6, 2007). For a fixed annuity, like TIAA's Traditional Annuity, the rate of return is guaranteed at the time of the investment; for a variable annuity, the return depends on the performance of the investments

during the accumulation phase. *NationsBank*, 513 U.S. at 254. As the prospectuses for TIAA's variable annuities reveal, those instruments exactly match the definition for variable annuities. *See* Dkt.76 at 42-43.

Plaintiffs take issue (Br. 44-45) with three aspects of TIAA's variable annuities – that participants can withdraw their investments at any point before the distribution phase; that until the distribution phase, the annuities do not make periodic payments; and that TIAA charges a fee for mortality expense risk. But they do not explain why any of those things means that the variable annuities are not annuities. Dkt.76 at 43-44. And they offer no factual support for their assertion that TIAA's fees were excessive; as the district court noted, TIAA's fees are far lower than the typical fees charged by other variable annuities in the market. *Id.* at 43 n.22.

Second, Plaintiffs do not allege any duty that Georgetown breached. *TIAA* named the variable annuities, not Georgetown. Dkt.76 at 41. And the annuities' prospectuses fully explain how they work. *Id.* at 41-42. As the district court noted, there is no duty to tell plan participants to read an investment's prospectus instead of relying on its name. *Id.* at 42. Plaintiffs have no response.

Third, Plaintiffs do not allege any harm related to the supposed mis-naming of the annuities. Dkt.76 at 44. They do not allege that recordkeeping fees would have been lower or returns would have been higher if Georgetown had realized that the variable annuities are not really annuities. Again, the district court pointed out the lack of allegations of harm, *id.*, and Plaintiffs have no response.

### C. Plaintiffs Fail To State A Claim Based On Reporting Obligations

In Count 3, Plaintiffs allege (Br. 45-48) that Georgetown breached a duty of candor by failing to accurately report TIAA's, Vanguard's, and Fidelity's compensation for recordkeeping services on Form 5500s it filed with the Department of Labor. *See* 29 C.F.R. § 2520.103-1(b)(1). That claim fails for three reasons.

First, ERISA does not impose a freestanding "duty of candor." It imposes duties of loyalty and prudence on plan fiduciaries, as well as duties to diversify investments and to adhere to governing plan instruments. 29 U.S.C. § 1104(a)(1). But ERISA does not contain a separate "duty of candor." Dkt.76 at 45 (citing 29 U.S.C. § 1104(a)). Neither does the law of trusts, from which ERISA's fiduciary obligations are derived. *Clark v. Feder Semo & Bard, P.C.*, 739 F.3d 28, 31 (D.C. Cir. 2014); *see* Dkt.76 at 25 (citing Restatement (Third) of Trusts §§ 77-79).

59

The Supreme Court has recognized that ERISA's duty of loyalty includes a duty not to lie to plan participants. *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996); *see Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 98 (3d Cir. 2012). But that is not the type of claim Plaintiffs bring here – their claim is that Georgetown's statements to the *government* are inaccurate. Proposed Compl. ¶ 151. Plaintiffs ask this Court to recognize some broader yet undefined duty of candor, which no court of appeals has done in a published decision.[5]

Second, ERISA's fiduciary obligations do not apply to filing Form 5500s as a matter of law. Fiduciary obligations apply to plan administrators "only 'to the extent'" that they perform fiduciary functions in relation to their plans. *Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000) (quoting 29 U.S.C. § 1002(21)(A)). When an administrator performs a ministerial function – such as "preparing and submitting regulatory filings" – he or she is

---

[5]   The Ninth Circuit expressly declined to decide "whether a fiduciary 'duty of candor' exists." *Bugielski*, 76 F.4th at 916 n.8. The Second Circuit mentioned a duty of candor in an unpublished decision, *see Taveras v. UBS AG*, 513 F. App'x 19, 24 (2d Cir. 2013), but cited only a case involving the duty of loyalty, *see In re Citigroup ERISA Litig.*, 662 F.3d 128, 143-44 (2d Cir. 2011). Plaintiffs argue (Br. 47 n.13) that *Chero-Key Piping Co. v. Great-W. Life & Annuity Ins.*, No. 08-cv-2696, 2010 WL 1169957 (S.D. Tex. Mar. 23, 2010), recognized a duty of candor, but the court was quoting the plaintiffs' allegations in that case, *see id.* at *4 n.2.

60

not acting as a fiduciary. *E.g.*, *Godfrey v. Greatbanc Tr. Co.*, No. 18-cv-7918, 2019 WL 4735422, at *3 (N.D. Ill. Sept. 26, 2019).

Filing Form 5500s is a ministerial act, not a fiduciary function. Every ERISA plan must file a Form 5500 each year, providing information about the plan's financial conditions, investments, and operations; it is "essentially [the plan's] annual tax return[]." Dkt.76 at 46 (internal quotation marks omitted). Courts repeatedly have held that filing a Form 5500 is not a fiduciary function. *E.g.*, *Godfrey*, 2019 WL 4735422, at *3; *Reed v. Queens Vill. Comm. for Mental Health for J-CAP, Inc.*, No. 18-cv-3114, 2019 WL 4452386, at *11 (E.D.N.Y. Sept. 17, 2019); Dkt.76 at 46. Similarly, the Department of Labor has advised that preparing "reports required by government agencies" is a ministerial and not fiduciary function. 29 C.F.R. § 2509.75-8. Plaintiffs cite no authority to the contrary.

Third, Plaintiffs fail to allege that they were harmed by the alleged errors in Georgetown's Form 5500s. They do not allege that they paid higher fees as a result, or that Georgetown would have achieved lower fees if it had caught the supposed errors. *See* Proposed Compl. ¶¶ 151-53. For that reason as well, they do not plead any valid claim in Count 3.

61

## CONCLUSION

The Court should affirm the district court's judgment.

Dated:  October 27, 2023                    Respectfully submitted,

                                            /s/ *Nicole A. Saharsky*

Nancy G. Ross                               Nicole A. Saharsky
MAYER BROWN LLP                             E. Brantley Webb
71 South Wacker Drive                       Minh Nguyen-Dang
Chicago, IL 60606                           MAYER BROWN LLP
(312) 701-8788                              1999 K Street NW
                                            Washington, DC 20006
                                            (202) 362-3000
                                            nsaharsky@mayerbrown.com

62

**ADDENDUM**

## APPLICABLE STATUTES AND REGULATIONS

**1. 29 U.S.C. § 1001(b) provides:**

(b)  Protection of interstate commerce and beneficiaries by requiring disclosure and reporting, setting standards of conduct, etc., for fiduciaries.  It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

**2. 29 U.S.C. § 1002 provides, in relevant part:**

(14)  The term "party in interest" means, as to an employee benefit plan –

. . .

(B)  a person providing services to such plan;

. . .

(21)

(A)  Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any

authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title.

### 3. 29 U.S.C. § 1104(a)(1) provides:

(a)    Prudent man standard of care

(1)    Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A)    for the exclusive purpose of:

(i)    providing benefits to participants and their beneficiaries; and

(ii)    defraying reasonable expenses of administering the plan;

(B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C)    by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D)    in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

**4.  29 U.S.C. § 1106(a) provides:**

(a)    Transactions between plan and party in interest.  Except as provided in section 1108 of this title:

    (1)    A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

        (A)    sale or exchange, or leasing, of any property between the plan and a party in interest;

        (B)    lending of money or other extension of credit between the plan and a party in interest;

        (C)    furnishing of goods, services, or facilities between the plan and a party in interest;

        (D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

        (E)    acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

    (2)    No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107(a) of this title.

**5.  29 U.S.C. § 1108(b)(2) provides, in relevant part:**

(b)    Enumeration of transactions exempted from section 1106 prohibitions.  The prohibitions provided in section 1106 of this title shall not apply to any of the following transactions:

. . .

(2)

    (A)    Contracting or making reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor.

    (B)

        (i)    No contract or arrangement for services between a covered plan and a covered service provider, and no extension or renewal of such a contract or arrangement, is reasonable within the meaning of this paragraph unless the requirements of this clause [1] are met.

        . . .

        (iii)    A covered service provider shall disclose to a responsible plan fiduciary, in writing, the following:

        . . .

        (III)    A description of all direct compensation, either in the aggregate or by service, that the covered service provider, an affiliate, or a subcontractor reasonably expects to receive in connection with the services described in subclause (I).

        (IV)

        (aa)    A description of all indirect compensation that the cov-

4a

ered service provider, an af-
filiate, or a subcontractor
reasonably expects to receive
in connection with the ser-
vices described in subclause
(I) –

(AA) including compensa-
tion from a vendor to a
brokerage firm based
on a structure of incen-
tives not solely related
to the contract with the
covered plan; and

(BB) not including compen-
sation received by an
employee from an em-
ployer on account of
work performed by the
employee.

. . .

## 6.  29 U.S.C. § 1109(a) provides:

(a)    Any person who is a fiduciary with respect to a plan who
breaches any of the responsibilities, obligations, or duties
imposed upon fiduciaries by this subchapter shall be per-
sonally liable to make good to such plan any losses to the
plan resulting from each such breach, and to restore to
such plan any profits of such fiduciary which have been
made through use of assets of the plan by the fiduciary,
and shall be subject to such other equitable or remedial
relief as the court may deem appropriate, including re-
moval of such fiduciary.  A fiduciary may also be removed
for a violation of section 1111 of this title.

**7.  29 U.S.C. § 1132(a) provides, in relevant part:**

(a)     Persons empowered to bring a civil action.  A civil action may be brought –

. . .

(2)     by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3)     by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

. . .

**8.  29 C.F.R. § 2550.103-1 provides, in relevant part:**

(b)     Contents of the annual report for plans with 100 or more participants electing the limited exemption or alternative method of compliance.  Except as provided in paragraphs (d) and (f) of this section and in §§ 2520.103-2, 2520.103-14, and 2520.104-44, the annual report of an employee benefit plan covering 100 or more participants at the beginning of the plan year which elects the limited exemption or alternative method of compliance described in paragraph (a)(2) of this section shall include:

(1)     A Form 5500 "Annual Return/Report of Employee Benefit Plan" and any statements or schedules required to be attached to the form, completed in accordance with the instructions for the form, including Schedule A (Insurance Information), Schedule C (Service Provider Information), Schedule D (DFE/Participating Plan Information), Schedule G

(Financial Transaction Schedules), Schedule H (Financial Information), Schedule MEP (Multiple-Employer Plan), Schedule MB (Multiemployer Defined Benefit Plan and Certain Money Purchase Plan Actuarial Information), Schedule SB (Single-Employer Defined Benefit Plan Actuarial Information), Schedule R (Retirement Plan Information), and other financial schedules described in § 2520.103-10. See the instructions for this form.

. . .

**9.  29 C.F.R. § 2550.404a-1 provides, in relevant part:**

(a)  In general.  Sections 404(a)(1)(A) and 404(a)(1)(B) of the Employee Retirement Income Security Act of 1974, as amended (ERISA or the Act) provide, in part, that a fiduciary shall discharge that person's duties with respect to the plan solely in the interests of the participants and beneficiaries; for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan; and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

(b)  Investment prudence duties.

(1)  With regard to the consideration of an investment or investment course of action taken by a fiduciary of an employee benefit plan pursuant to the fiduciary's investment duties, the requirements of section 404(a)(1)(B) of the Act set forth in paragraph (a) of this section are satisfied if the fiduciary:

(i)  Has given appropriate consideration to those facts and circumstances that, given the scope

of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio or menu with respect to which the fiduciary has investment duties; and

(ii)   Has acted accordingly.

(2)   For purposes of paragraph (b)(1) of this section, "appropriate consideration" shall include, but is not necessarily limited to:

(i)   A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties) or menu, to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action compared to the opportunity for gain (or other return) associated with reasonably available alternatives with similar risks . . . .

. . .

(4)   A fiduciary's determination with respect to an investment or investment course of action must be based on factors that the fiduciary reasonably determines are relevant to a risk and return analysis, using appropriate investment horizons consistent with the plan's investment objectives and taking into account the funding policy of the plan established pursuant to section 402(b)(1) of ERISA. Risk and return factors may include the economic effects of climate

change and other environmental, social, or governance factors on the particular investment or investment course of action. Whether any particular consideration is a risk-return factor depends on the individual facts and circumstances. The weight given to any factor by a fiduciary should appropriately reflect a reasonable assessment of its impact on risk-return.

(c) Investment loyalty duties.

    (1) A fiduciary may not subordinate the interests of the participants and beneficiaries in their retirement income or financial benefits under the plan to other objectives, and may not sacrifice investment return or take on additional investment risk to promote benefits or goals unrelated to interests of the participants and beneficiaries in their retirement income or financial benefits under the plan.

    (2) If a fiduciary prudently concludes that competing investments, or competing investment courses of action, equally serve the financial interests of the plan over the appropriate time horizon, the fiduciary is not prohibited from selecting the investment, or investment course of action, based on collateral benefits other than investment returns. A fiduciary may not, however, accept expected reduced returns or greater risks to secure such additional benefits.

    (3) The plan fiduciary of a participant-directed individual account plan does not violate the duty of loyalty under paragraph (c)(1) of this section solely because the fiduciary takes into account participants' preferences in a manner consistent with the requirements of paragraph (b) of this section.

    . . .

**10.  29 C.F.R. § 2550.408b-2 provides, in relevant part:**

(a)  In general.  Section 408(b)(2) of the Employee Retirement Income Security Act of 1974 (the Act) exempts from the prohibitions of section 406(a) of the Act payment by a plan to a party in interest, including a fiduciary, for office space or any service (or a combination of services) if:

   (1)  Such office space or service is necessary for the establishment or operation of the plan;

   (2)  Such office space or service is furnished under a contract or arrangement which is reasonable; and

   (3)  No more than reasonable compensation is paid for such office space or service.

   . . .

(b)  Necessary service.  A service is necessary for the establishment or operation of a plan within the meaning of section 408(b)(2) of the Act and § 2550.408b-2(a)(1) if the service is appropriate and helpful to the plan obtaining the service in carrying out the purposes for which the plan is established or maintained.  A person providing such a service to a plan (or a person who is a party in interest solely by reason of a relationship to such a service provider described in section 3(14)(F), (G), (H), or (I) of the Act) may furnish goods which are necessary for the establishment or operation of the plan in the course of, and incidental to, the furnishing of such service to the plan.

(c)  Reasonable contract or arrangement –

   (1)  Pension plan disclosure –

      (i)  General.  No contract or arrangement for services between a covered plan and a covered service provider, nor any extension or renewal, is reasonable within the meaning of section 408(b)(2) of the Act and paragraph (a)(2) of this

section unless the requirements of this paragraph (c)(1) are satisfied. The requirements of this paragraph (c)(1) are independent of fiduciary obligations under section 404 of the Act.

. . .

(iv)  Initial disclosure requirements. The covered service provider must disclose the following information to a responsible plan fiduciary, in writing –

. . .

(C)  Compensation –

(1)  Direct compensation. A description of all direct compensation (as defined in paragraph (c)(1)(viii)(B)(1) of this section), either in the aggregate or by service, that the covered service provider, an affiliate, or a subcontractor reasonably expects to receive in connection with the services described pursuant to paragraph (c)(1)(iv)(A) of this section.

(2)  Indirect compensation. A description of all indirect compensation (as defined in paragraph (c)(1)(viii)(B)(2) of this section) that the covered service provider, an affiliate, or a subcontractor reasonably expects to receive in connection with the services described pursuant to paragraph (c)(1)(iv)(A) of this section; including identification of the services for which the indirect compensation will be received, identification of the payer

of the indirect compensation, and a description of the arrangement between the payer and the covered service provider, an affiliate, or a subcontractor, as applicable, pursuant to which such indirect compensation is paid.

. . .

(ix) Exemption for responsible plan fiduciary. Pursuant to section 408(a) of the Act, the restrictions of section 406(a)(1)(C) and (D) of the Act shall not apply to a responsible plan fiduciary, notwithstanding any failure by a covered service provider to disclose information required by paragraph (c)(1)(iv) or (vi) of this section, if the following conditions are met:

(A) The responsible plan fiduciary did not know that the covered service provider failed or would fail to make required disclosures and reasonably believed that the covered service provider disclosed the information required by paragraph (c)(1)(iv) or (vi) of this section;

. . .

(3) Termination of contract or arrangement. No contract or arrangement is reasonable within the meaning of section 408(b)(2) of the Act and paragraph (a)(2) of this section if it does not permit termination by the plan without penalty to the plan on reasonably short notice under the circumstances to prevent the plan from becoming locked into an arrangement that has become disadvantageous. A long-term lease which may be terminated prior to its expiration (without penalty to the plan) on reasonably short notice under the circumstances is not generally an unreasonable arrangement merely because

12a

of its long term.  A provision in a contract or other arrangement which reasonably compensates the service provider or lessor for loss upon early termination of the contract, arrangement, or lease is not a penalty.  For example, a minimal fee in a service contract which is charged to allow recoupment of reasonable start-up costs is not a penalty.  Similarly, a provision in a lease for a termination fee that covers reasonably foreseeable expenses related to the vacancy and reletting of the office space upon early termination of the lease is not a penalty.  Such a provision does not reasonably compensate for loss if it provides for payment in excess of actual loss or if it fails to require mitigation damages.

. . .

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), undersigned counsel certifies that this brief:

(i)     complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7) because it contains 12,930 words, including footnotes and excluding the parts of the petition exempted by Rule 32(f); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

Dated:  October 27, 2023              /s/ *Nicole A. Saharsky*
                                      Nicole A. Saharsky

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on October 27, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

 /s/ *Nicole A. Saharsky*
Nicole A. Saharsky